IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN THE MATTER OF PERSONAL RESTRAINT OF | ) ) ) | No. 35087-8-III |
| REUBEN D. MULAMBA, | ) ) ) ) ) | UNPUBLISHED OPINION |

FEARING, J. — In 2015, this court affirmed the convictions of Reuben Denis

Mulamba (Denis Mulamba) for two counts of assault of a child and two counts of

criminal mistreatment of a child. We now grant his personal restraint petition and

remand for a new trial on the four charges. We hold that Mulamba was entitled to a jury

unanimity instruction on the two charges of assault of a child because of multiple acts of

alleged assault against each child presented by the State to the jury. We also hold that the

State failed to disclose *Brady* material to Mulamba when it failed to disclose jail records

of the principal witness against him, the witness being the mother of the child victims.

These failures constituted constitutional error that imposed substantial and actual

prejudice on Mulamba.

FACTS

Denis Mulamba's personal restraint petition and his earlier convictions arise from

his conduct toward the two young children of Ashley Eli: Stanley, born April 15, 2003,

and Jane, born February 24, 2007.  We use fictitious names, rather than initials, to humanize the children.

In the summer of 2011, Ashley Eli and her two children lived in Moses Lake.  Eli then met petitioner Denis Mulamba at a Moses Lake bar.  Eventually Eli worked as a nurse assistant at Golden Age Afh, an adult family home and care facility owned by Mulamba's mother.

In August 2011, Ashley Eli began dating Denis Mulamba, who attended Central Washington University, but returned to Moses Lake on weekends to work at Golden Age Afh.  In October, Mulamba rented a two-bedroom apartment in Ellensburg.  A month later, Eli and Jane stayed at Mulamba's apartment from Monday through Thursday, while Stanley resided with his grandmother in Moses Lake.

Ashley Eli and Denis Mulamba's relationship deteriorated in December 2011 due in part to Mulamba's criticism of Eli for failing to discipline her children.  Despite the souring, Eli, who lost employment, and her two children moved into Mulamba's Ellensburg apartment in early January 2012.  Eli also failed to find employment in Ellensburg.  The arguments between Eli and Mulamba increased, with Mulamba telling Eli he would be happier if she disciplined her children.  Mulamba labeled Eli a "bad mom."  Report of Proceedings (RP) at 138, *State v. Mulamba*, No.31314-0-III (Wash. Ct. App.).

On January 13, 2012, after an argument, Ashley Eli sought to leave Denis Mulamba's Ellensburg apartment with her children, but Mulamba commandeered her keys. After police intervened, Eli departed the apartment, but she returned the next day because of belongings remaining inside. She and her children apparently continued to reside in the apartment for weeks thereafter.

The undisputed evidence established grave injuries suffered by Jane and Stanley in late January 2012. Ashley Eli claims that Denis Mulamba caused the injuries, while punishing the children on many occasions. Mulamba claims Eli caused the injuries during her punishment of the children. We relate some of the testimony of both. We interpose some of the trial testimony of Stanley, who blamed Mulamba. The numerous acts of assault generate the issue of jury unanimity posed by Mulamba's personal restraint petition.

In his trial testimony, Denis Mulamba declared unhappiness with Ashley Eli because Eli's daughter Jane often urinated in her pants and on his apartment floor. Eli failed to discipline Jane for this crude behavior.

During trial, Ashley Eli admitted that, during January 2012, she spanked both children, but she denied using a cable to whip them and denied that her spankings harmed them. Eli initially testified that she first learned, on Saturday, January 21, that Denis Mulamba physically punished her children. Later during trial, Eli recounted an incident of January 14 when Jane wet the bed while staying at the Golden Age Afh in Moses

Lake. Eli then spanked Jane on the bottom with her hand, after which Mulamba complained that the spanking insufficiently punished the child. Mulamba thereafter assumed the punishment of both children. On January 14, Mulamba took Jane to the garage of the adult family home. Eli averred that, despite Mulamba and Jane remaining at length in the garage, she did not know what action Mulamba took and did not notice any marks on Jane thereafter.

According to Denis Mulamba, during the week of January 16, 2012, he fell ill, left the Ellensburg apartment, and went to Moses Lake to visit a doctor. On his return, he spent the majority of his time at classes or the school library in order to avoid Eli and her children.

According to Denis Mulamba, he, Ashley Eli, and the two children spent Saturday, and Sunday, January 21 and 22, in Moses Lake. He testified that, on Saturday morning, he directed Eli to take the children home to Ellensburg after discovering that Jane wet the bed. Apparently Eli did not follow Mulamba's directions to go to Ellensburg. Mulamba denied punishing Jane during that weekend.

During trial testimony, Ashley Eli described several incidents of punishment meted by Denis Mulamba on Stanley and Jane during the weekend of January 21 and 22. On Sunday, January 22, while in Moses Lake at Golden Age Afh, Eli observed Mulamba spank Stanley first with wood and then with a metal bar. She ordered Mulamba to stop when she noticed the spanking caused a bruise on Stanley's buttocks. That same night,

4

during the family's return drive to Ellensburg, Mulamba, according to Eli, threatened to pinch Stanley with pliers. During the trip, Mulamba beat both children with a belt when stopped at a rest stop.

During trial, Stanley averred that Denis Mulamba began hitting him on the back and legs with a belt two weeks after his family moved to Ellensburg. Mulamba once pinched his chest with pliers.

Ashley Eli testified that, sometime during the week of January 23, she went to spank Jane and first noticed bruising on her young body. During that week, according to Eli, Denis Mulamba beat the children with a belt. She did not then protest because her parents punished her siblings with a belt. Eli added that Mulamba later began use of an electric cord or a coaxial cable. Mulamba also forced Stanley and Jane to perform "wall sits." If a child could not hold the sit for two minutes, Mulamba beat him or her and demanded that the child start the wall sit again. Eli insisted that Mulamba ordered the wall sits during three separate nights of the week of January 23. During her testimony, Eli admitted that she gagged each child respectively on one occasion, while Mulamba beat the child, in an attempt to stop the child's crying.

During trial, Denis Mulamba recalled that, on Tuesday, January 24, Jane urinated on the floor of the Ellensburg apartment. According to Mulamba, Eli, not him, punished Jane by insisting that she wall sit and by hitting her on the hands with a wire. He did not

interfere because Jane was not his child. He left to study at the library. When he returned he saw that Eli had shaved her head, an unsettling event to Mulamba.

During trial testimony, Denis Mulamba declared that Stanley, on the evening of January 25, spilled a drink on the couch, and Ashley Eli instructed him to spank Stanley. Mulamba spanked him with the cord of a phone charger. The next day, he spanked Jane on her bottom with a belt after she urinated on the carpet.

Ashley Eli declared that, on January 26, Denis Mulamba threatened to burn Jane with a clothes iron and that he beat the children with the iron's cord. Nevertheless, she never saw Mulamba burn Jane with the iron. She denied burning Jane. Stanley testified that, although he later saw burns on Jane's legs, he never saw Denis Mulamba burn her. Stanley described an incident, during which Mulamba held an iron so close to his body that he felt heat. Mulamba never burned him, however.

The quartet returned to Moses Lake on Friday evening, January 27. Denis Mulamba testified that he worked the graveyard shift at Golden Age Afh on the night of January 27 and did not see Eli or the children until the afternoon of Sunday, January 29. He remembered that Jane appeared in pain that evening, and Eli asked him to retrieve hydrogen peroxide. Mulamba then went to the library, where he remained until almost midnight, and, on his return home, he told Eli to pack her belongings and leave the apartment. He denied seeing Jane's injuries on the evening of January 29.

6

According to Ashley Eli, on Sunday, January 29, Jane vomited her dinner. An angry Denis Mulamba accused Jane of purposely vomiting. Mulamba coerced Jane to perform a "wall sit," and, when Jane fell from the wall, Mulamba beat her with the coaxial cable. When Eli undressed her daughter for a bath, she discovered bruises blotching the little girl's body and black wounds on the child's legs. At Eli's direction, Denis Mulamba bathed and cleansed the wounds with hydrogen peroxide.

Stanley declared during trial that, on January 29, Denis Mulamba threatened to burn him, but presented him the option of being burned or going outside in the cold without a coat. Stanley chose to go outside.

On the night of January 29, Ashley Eli, with her two children, left Denis Mulamba's apartment for a motel room. On January 31, after smelling sickness and infection on Jane, Eli took the children to Aspen Women's Domestic Violence Shelter. She explained to Aspen supervisor Kathleen Coppin that she and her children needed housing because her boyfriend beat the children. She declined to identify her boyfriend. Coppin discussed the situation with Ellensburg Police Department Detective Tim Weed, after which Coppin drove Eli, Jane, and Stanley to the police station for interviews.

At the Ellensburg police station, Ashley Eli again refused to identify her boyfriend. Kathleen Coppin, who sat near Jane at the station, noticed her experiencing pain. Coppin drove all three family members to Kittitas Valley Community Hospital's emergency room. At the hospital, Nurse John Yoder examined Jane and observed

bruising on Jane's left side and arm and stripes on her back. Yoder smelled an aroma of dead flesh and infection. After raising Jane's nightgown and observing severe burns on the girl's legs, Yoder summoned Dr. David Frick.

While the emergency room waited for the arrival of Dr. David Frick, Erik Davis tended to Stanley. Davis noticed "raised edge marks" that covered Stanley from his shoulder down to his ankle. RP at 536. Stanley told Davis he had been whipped with belts and wires and pinched with pliers.

Dr. David Frick examined Jane and assessed her condition as serious to critical. Frick observed second and third degree burns on Jane's thighs and buttocks which appeared at least three days old. The burns would leave permanent ugly scars. Frick quickly transferred Jane, by airlift, to Seattle's Harborview Burn Center. During an examination of Stanley, the young boy told Dr. Frick that his mother's boyfriend abused him with belts and wire. Frick feared head and liver injuries to Stanley and transferred him by ambulance to Harborview.

Detective Tim Weed interviewed Ashley Eli at Kittitas Valley Community Hospital. During the interview, Eli admitted she spanked each of the children with a rainbow belt and folded television cable and that she gagged the children to quiet their cries. She acknowledged striking Stanley with a metal track, purportedly to prevent her boyfriend from doing so. After completing the interview, Weed arrested Eli for criminal mistreatment based on her failure to obtain medical care for her children.

At Harborview Medical Center, Dr. Kenneth Feldman examined Jane and Stanley. Dr. Feldman diagnosed Jane with a urinary tract infection, anemia, and kidney failure. Feldman opined that Jane could have died from the kidney failure, if left untreated. Feldman found Stanley severely injured throughout his entire young body, except his head. In Dr. Feldman's opinion, the injuries to both children were inflicted over several days.

Child Protective Services employee Marti Miller, with Detective Tim Weed present, interviewed Stanley and Jane on February 2. During the interview, Stanley told Miller that Denis Mulamba had whipped him and his sister with a belt or wire if they did not listen, used a pair of pliers to pinch his skin, one time ordered him to run after the car while his mother drove, and threatened to burn him with an iron. After the car chase incident, Mulamba told Stanley that he was "gonna get beat to death." Clerk's Papers (CP) at 685. Stanley also told Miller that, before the interview, his mother instructed Jane and him not to disclose Mulamba's name. During her interview, Jane told Miller that her mother directed her not to talk about her injuries, to say she had only been spanked on the bottom with a hand, and not to disclose who spanked her. Jane also told Marti Miller that her mother cleaned the house during some of the abuse.

PROCEDURE

The State of Washington charged Denis Mulamba with four counts all being committed between January 13 and 29, 2012: (1) assault of a child in the first degree

9

under RCW 9A.36.120, with Jane as the victim; (2) assault of a child in the second degree under RCW 9A.36.130, with Stanley as the victim; (3) criminal mistreatment in the first degree under RCW 9A.42.020, with Jane as the victim; and (4) criminal mistreatment in the second degree under RCW 9A.42.030 with Stanley as the victim. The crime of assault entails the act of physically striking a child, while criminal mistreatment involves the failure to procure needed medical treatment for a child. The charging information omitted any reference to any particular act performed by Mulamba that constituted any of the alleged crimes. The amended information also alleged all alternative means, under the respective statutes, for the crimes of assault of a child in the first degree and in the second degree.

In a separate proceeding, the State charged Ashley Eli with crimes stemming from the abuse of her two children. Before trial on the charges against Denis Mulamba, Eli reached a plea agreement with the State in her prosecution. In exchange for pleading guilty to two counts of criminal mistreatment and providing testimony, in the Mulamba, trial, consistent with her interviews with police, the prosecutor would recommend, to the sentencing court, a ten-year prison sentence. Under the agreement, Eli would not be sentenced until after the State knew whether Eli testified favorably in Mulamba's trial.

Between February 2012 and beyond the trial of Denis Mulamba, Ashley Eli resided at the Kittitas County Corrections Center. According to jail records, Eli caused disruption and engaged in violent outbursts due to mental health illness, including

10

depression. Between May and October 2012, Ashley Eli received thirteen infractions for possession of contraband, possession of a weapon, mailing notes between inmates, inappropriate language, screaming, refusing orders, escape, banging on doors, resisting restraints, refusing placement, attempting to riot, wreaking property damage, and self-mutilation.

Ashley Eli suffered from anxiety while in jail. The county mental health professional visited with Eli on numerous occasions in the jail. Eli frequently refused meals and some days went without any food. She often pounded on her prison door. She verbally abused jail officers. She spontaneously removed clothing. She repeatedly smuggled razors into the jail.

Records produced by the jail include documents prepared by Central Washington Comprehensive Mental Health. Some of the records are unreadable. A February 15, 2012, note from the mental health facility records that Ashley Eli suffers from depression and maintains suicidal ideation.

In late May 2012, Ashley Eli hid a razor in her cell, which concealment raised concerns about suicidal ideation. In a May 25, 2012, postcard to a friend, Eli indicated that the officer who found the razor saved her life. A Comprehensive Mental Health note, from June 20, 2012, documents Eli sitting in the fetal position and continuously crying after a suicide attempt.

On August 10, 2012, Ashley Eli hoarded a razor under her sink. She stated then that she often thinks of hurting herself.

Because of uncontrolled behavior on September 10, 2012, prison officers placed Eli in a restraint chair. Because of her bouncing in and damage to the chair, officers transferred her to a restraint board. On the night of September 10, Eli continuously banged on her cell door for one and one-half hours. On September 12, Eli refused meals and tore an infraction notice served on her.

On October 21, 2012, Ashley Eli slit her arm with a razor. Jails officials then again removed all sharp objects from Eli. On October 23, Eli wrote a suicide note.

On October 26, a jail sergeant wrote a note that read, in part: Ashley Eli "cannot be trusted by the way she hides, hordes, and lies. . . ." Supplemental declaration of Neil M. Fox with Additional Exhibits (Fox supplemental declaration) at 215. The note referred to Eli as being in a "downward spiral." Fox supplemental declaration, at 215. The sergeant wrote the note one week before Denis Mulamba's trial and during the time that the prosecuting attorney met with Eli to prepare her for trial.

Jail records indicate that the prosecutor met with Ashley Eli on multiple occasions prior to trial. On October 22, 2012, the prosecuting attorney met with Eli. On October 23, the prosecuting attorney again met again with Eli. A jail note reads that Eli refused instructions by officers when transported to the October 23 meeting, although the record does not indicate whether she behaved badly in the prosecutor's presence. In

postsentence attacks on her guilty plea, Eli asserted that the deputy prosecutor visited her in jail, knew of her mental health illness, and told her things would be better in prison.

We do not know what, if any, records Denis Mulamba's trial counsel demanded from the State before trial. We do not know what, if any, records the State produced to Mulamba's attorney before trial. We know that the State provided trial counsel no records from Ashley Eli's incarceration.

A seven-day trial in Denis Mulamba's prosecution began on October 31, 2012. On November 1, Ashley Eli testified at trial while shackled and dressed in prison garb. Eli testified that she agreed to plead guilty to two charges of criminal mistreatment based on her delay in seeking medical help in exchange for a ten year sentence, on the condition that she would testify for the State. She admitted that, under the agreement, if she failed to testify she would receive a fifteen year sentence. She admitted that she agreed to blame Denis Mulamba.

During trial, Ashley Eli informed the jury that she lied when she told a police officer that she used a belt and a television cable to beat her children. She claimed that she did not see Jane's injuries until January 29 because, before that Sunday, Jane bathed herself. Counsel presented Eli with a letter that showed, as early as January 28, she saw open wounds after noticing blood in Jane's underwear and that Eli then asked Denis Mulamba to garner medical supplies to treat the wounds. During testimony, Eli claimed that, despite leaving Mulamba's apartment on January 29, she delayed taking her children

13

to the hospital for two days because of the expectation that medical professionals would blame her for the injuries.

During trial, Jane identified Denis Mulamba as the person who hurt her, but she failed to recall any details about her punishments other than that Mulamba struck her on her bottom. She told the jury that neither her mother nor Mulamba ever burned her.

During trial, Denis Mulamba admitted that, during a police interview, he stated that Ashley Eli granted him permission to spank the children on their bottoms with his hand, belt, or a wire. He admitted to spanking the children, but denied ever using a coaxial cable. He insisted that Eli whipped the children with the coaxial cable. Mulamba denied using pliers to pinch Stanley, but admitted he pinched Stanley on the stomach area and the pinching likely caused bruising. He denied burning Jane with the iron or threatening Stanley with the iron, and he further denied seeing Eli inflict any injuries with the iron.

During his testimony, Denis Mulamba told the jury that he thought Ashley Eli was crazy and acting erratically in January. He averred that he spent most of the month trying to remove her and her children from his apartment. He suggested that, because of his work and school, he maintained scant contact with the children during late January and that Eli had countless opportunities to injure the children in his absence. He assumed that Eli caused all of the children's serious injuries.

During cross-examination of Denis Mulamba, the prosecuting attorney established Mulamba as being a convicted thief. The prosecutor posed a question to Mulamba about his difficulty with the truth.

The trial court instructed the jury, with respect to count 1, first degree child assault of a child:

> To convict the defendant of the crime of Assault of a Child in the First Degree as to [Jane], the State of Washington must have proved beyond a reasonable doubt that:
> (1) On or between the dates of January 13, 2012 and January 29, 2012, the defendant:
> (a) committed the crime of Assault in the First Degree against [Jane] OR
> (b) intentionally assaulted [Jane] and recklessly inflicted great bodily harm OR
> (c) intentionally assaulted [Jane] and caused substantial bodily harm, and the defendant had previously engaged in a pattern or practice of assaulting [Jane] which had resulted in bodily harm that was greater than transient physical pain or minor temporary marks or caused [Jane] physical pain or agony that was equivalent to that produced by torture.

Personal Restraint Petition (PRP), Exhibit 9 at 36 (instruction 13). In jury instruction 27, the court also instructed the jury that assault in the first degree, one of the alternative methods of committing first degree assault of a child, constituted the act of assaulting another and inflicting "great bodily harm," while intending to inflict the great bodily harm.

As to count 2, second degree assault of a child as to Stanley, the trial court instructed the jury:

15

To convict the defendant of the crime of Assault of a Child in the Second Degree as to [Stanley], the State of Washington must have proved beyond a reasonable doubt that:
(1) On or between the dates of January 13, 2012 and January 29, 2012, the defendant:
(a) committed the crime of Assault in the Second Degree against [Stanley] OR
(b) intentionally assaulted [Stanley] and caused bodily harm that was greater than transient physical pain or minor temporary marks, and the defendant had previously engaged in a pattern or practice of assaulting [Stanley] which had resulted in bodily harm that was greater than transient physical pain or minor temporary marks or caused [Stanley] physical pain or agony that was equivalent to that produced by torture,
. . .

PRP, Exhibit 9 at 40 (instruction 17). Jury instruction 28 defined for the jury the crime of second degree assault, one of the alternative means of committing second degree assault of a child, as follows:

A person commits the crime of Assault in the Second Degree when he or she intentionally assault another and recklessly inflicts substantial bodily harm, or assaults another with a deadly weapon, or knowingly inflicts bodily harm which by design causes such pain or agony as to be the equivalent of that produced by torture.

PRP, Exhibit 9 at 51 (instruction 28). At trial, Denis Mulamba never objected to jury instructions 13, 17, 27, or 28.

During summation, the State's attorney told the jury that it could find Denis Mulamba guilty of the count of assault against Jane and the count of assault against Stanley based either on a pattern of conduct or on a discrete act. The prosecuting attorney commented:

16

I'll explain the first degree count assault in the—of a child in the First Degree gives you two options. To convict him essentially actually to [two] alternatives. You could find that he committed one count of assault in the first degree because that's how it reads to be convicted of the crime of assault of a child first degree either find that he committed accounts of assault in the First Degree which could be one iron imprint, one third degree burn, one time or you go back there and you're I'm [sic] not all certain about that. But you do know one thing you do know that over a period of time he was beating go those kids and whipping those kids and that's with regards to [Jane]. Even [Stanley] it arose to a pattern of inflicted injury over a period of time. And so that's your second alternative. You can find just one count of assault he'd done or I am not so certain on the iron but when you take it all in its entirety, yeah. We are certain he was part of the greater degree and over the pattern and the period of time, particularly, between Monday the 23rd to Friday the 27th he did the majority and you can find him guilty as charged. For [Stanley] it's similar except it's you either find him guilty for one incident involving an assault in the second degree i.e. taking a co axle [co-axial] cable. [Stanley] can't hold that wall sit and one beating 19 times on his left leg creating substantial bodily harm. A little bit less than the bodily harm that [Jane] incurred or you don't find there's one incident and that he contributed over a period of time that he simply contributed to the injuries over a period of time.

RP at 1077-78.

During the State's closing statement, the State's counsel compared the credibility of Denis Mulamba with Ashley Eli. He often attacked the credibility of Mulamba by juxtaposing his trial testimony with inconsistent statements to law enforcement officers. In turn, counsel bolstered Eli's credibility:

But in evaluating the credibility of Ashley within the world she lives in are those admissions of a woman attempting to minimize her culpability or a description a real life description of how this is going down.

RP at 1084. Counsel added:

17

> Because the case doesn't just hinge upon Ashley Eli but yet I would submit to you there's a stream of evidence and truth that flows through her testimony.

RP at 1084.

In closing statement, defense counsel attempted to rebut the State's counsel's comments about Ashley Eli's credibility. Mulamba's attorney intoned:

> But the prosecutor starts off by talking how Ashley should still be believed. Who are we kidding? He is saying she's nuts. She's crazy but we should believe her when she says she can't remember if she saw [Jane] wounded on Friday or Saturday or Sunday.

RP at 1099-1100.

The jury found Denis Mulamba guilty of first degree child assault of Jane, second degree child assault of Stanley, first degree criminal mistreatment of Jane, and third degree criminal mistreatment of Stanley. The jury also returned special verdicts for counts 1, 2, and 3 by answering "yes" to the question of whether Mulamba knew or should have known that the "victim of the current offense was particularly vulnerable or incapable of resistance." CP at 479-80, 483.

On November 15, 2012, Eli wrapped a sheet around her neck and tied the sheet to holes in a top bunk. Jail officers found her leaning back and straining the sheet against the back of her neck. Her face had turned blue. Officers untied the sheet and placed her on a restraint board. She refused to speak to officers. The jail placed Eli on suicide watch. In the coming days, she refused food and her medications.

18

On direct appeal, Denis Mulamba challenged the admission of child hearsay, the

finding of competency of Jane to testify, the admissibility of testimony from a social

worker, and the sufficiency of the evidence to find vulnerability in Stanley. This court

affirmed the convictions and sentence. *State v. Mulamba*, noted at 188 Wn. App. 1013

(2015) (unpublished).

Denis Mulamba timely filed a personal restraint petition. The petition attached jail

records for Ashley Eli, obtained post-conviction, which Mulamba contends the State

failed to disclose despite a duty to disclose. Petitioner's counsel obtained the records

through a public records act request accompanied by a release of information executed by

Eli.

## LAW AND ANALYSIS

In this personal restraint petition, Denis Mulamba challenges both his convictions

and his sentence. He seeks a new trial on four grounds: prosecution in Kittitas County

violated the Washington and federal constitutional vicinage requirements because some

of the alleged acts of assault occurred in Grant County; contacts between the prosecuting

attorney's office and court staff about the number of people to call for the venire reduced

the randomness of the jury pool; the State violated *Brady v. Maryland* principles when

failing to disclose, to his counsel, jail records of Ashley Eli; and the trial court's

instructions to the jury breached his constitutional right to a unanimous jury verdict.

Acceptance of his challenge to the lack of a jury unanimity instruction would only

19

reverse convictions for first degree assault of a child and second degree assault of a child. Acceptance of any of the remaining three challenges would reverse all four convictions.

We agree that the State withheld *Brady* documents to the prejudice of Mulamba. We therefore remand for a new trial on all charges. We also discuss Mulamba's jury unanimity challenge and his vicinage challenge since those challenges could repeat themselves on remand. We hold that prosecution in Kittitas County did not violate the vicinage requirement. We rule, however, that jury instructions denied Mulamba his constitutional right to a unanimous jury verdict. We do not address Mulamba's challenge to the contact between the prosecuting attorney's office and the court administration office about the jury pool or Mulamba's challenges to his sentencing because, assuming any error, the error will likely not be repeated.

The dissent refers to our ruling on the unanimous jury verdict as dicta, implying that the ruling need not be followed. Nevertheless, appellate courts routinely address issues unnecessary to resolve the appeal when the court remands for a new trial and the second trial will likely raise the issue again. The appellate court, in such instance, expects the ruling to be followed by the trial court, rather than being considered dicta.

To prevail in a personal restraint petition, a petitioner must establish (1) a constitutional error that resulted in actual and substantial prejudice, or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Personal Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016);

*see also In re Personal Restraint of Coats*, 173 Wn.2d 123, 132-33, 267 P.3d 324 (2011).

In his petition, Denis Mulamba relies only on constitutional error. A personal restraint

petition is not a substitute for a direct appeal, and the availability of collateral relief is

limited. *Personal Restraint of Dove*, 196 Wn. App. at 153. Relief by way of a collateral

challenge to a conviction is extraordinary, and the petitioner must meet a high standard

before this court will disturb an otherwise settled judgment. *Personal Restraint of Coats*,

173 Wn.2d at 132. Mulamba meets this high standard.

Vicinage

Denis Mulamba contends that we must vacate all of his convictions because some

of his conduct alleged to be criminal occurred in a county other than Kittitas County, the

county in which all jurors resided. Mulamba grounds this argument on the constitutional

vicinage requirement, which he differentiates from venue rules.

Venue demands the accused be tried in the county in which he allegedly

committed the crimes. Vicinage requires that the jurors be drawn from the county, in

which the crimes occurred. *State v. Howell*, 40 Wn. App. 49, 51, 696 P.2d 1253 (1985).

Stated slightly differently, venue refers to the location where the trial is held, whereas

vicinage refers to the area from which the jury pool is drawn. *Price v. Superior Court*, 25

Cal. 4th 1046, 1054, 25 P.3d 618, 108 Cal. Rptr. 2d 409 (2001). Nevertheless, the

concepts of venue and vicinage generally intertwine and the distinction is usually

unimportant, as a jury pool ordinarily is selected from the area in which the trial is held.

*State v. Howell*, 40 Wn. App. at 51; *Price v. Superior Court*, 25 Cal. 4th at 1054. Still, the accused's trial could proceed in one county's courthouse, with the jury selected from another county's denizens.

Denis Mulamba underlines that some of the acts, for which the State prosecuted him, occurred in Kittitas County, but, because some of the alleged assaults transpired in Grant County, we cannot be certain that a Kittitas County jury did not convict him for a crime occurring partly, if not entirely, in Grant County. The State, while citing secondary sources and one Washington Supreme Court decision that describes the nature of vicinage, argues that Denis Mulamba's crimes occurred in Kittitas County or, alternatively, that most of the crimes occurred in Kittitas County. The State does not recognize that the jury could have based all of Mulamba's convictions solely on an act occurring in Grant County.

The Washington Constitution provides:

> In criminal prosecutions the accused shall have the right . . . . to have a speedy public trial by an impartial jury of the *county* in which the offense is charged *to have been committed*.

CONST. art. I, § 22 (emphasis added). This constitutional provision seeks to guarantee the right to a trial by a jury in the county, in which the crime was committed, by defining the vicinage as a county. *State v. Ashe*, 182 Wash. 598, 603, 48 P.2d 213 (1935), *overruled on other grounds by State v. Goodwin*, 29 Wn.2d 276, 186 P.2d 935 (1947).

22

The right to be tried where the crime occurred serves to prevent the unfairness and hardship involved when the government prosecutes an accused in a remote place. *United States v. Cores*, 356 U.S. 405, 407, 78 S. Ct. 875, 2 L. Ed. 2d 873 (1958). Presumably the defendant would desire to be tried where witnesses and evidence are accessible and where he might gain the benefit from a good character, assuming he established one. *State v. Holloway*, 19 N.M. 528, 146 P. 1066, 1068 (1914). One court disagreed that the vicinage right protects individual rights. Instead, the court wrote that the vicinage right is not a personal right of the defendant because it belongs in part to the public to vindicate the community's right to sit in judgment on crimes committed within its territory. *People v. Guzman*, 45 Cal. 3d 915, 936-37, 755 P.2d 917, 248 Cal. Rptr. 467 (1988), *overruled on other grounds by Price v. Superior Court*, 25 Cal. 4th 1046 (2001).

Washington courts have recognized that the acts attendant to a crime may span multiple counties such that the vicinage may lie in more than one county. *State v. Ashe*, 182 Wash. 598, 603-04 (1935). In turn, venue may be proper in multiple counties depending on the nature of the charged crime. *State v. Howell*, 40 Wn. App. 49, 51-52 (1985). When the State alleges that the crimes occurred in one county, the State satisfies the vicinage rule if the jury is empaneled from individuals living in that county, even if defendant's offense spanned more than one county such that venue may have been proper in more than one county. *State v. Howell*, 40 Wn. App. at 51-52.

In *State v. Ashe*, 182 Wash. 598 (1935), the state Supreme Court held that a prosecution in King County for placing a girl in a house of prostitution did not violate Washington's constitutional vicinage requirement, despite Leo Ashe placing the victim into a Pierce County professional home. Ashe took custody of the girl in King County and transported her from King County to Pierce County. The court reasoned that an ongoing crime can be committed in more than one county and can be prosecuted in any county in which an act occurred without violating the vicinage requirement.

In *State v. Howell*, 40 Wn. App. 49 (1985), this court applied the holding in *State v. Ashe* to a prosecution for theft of livestock. Harvey Howell stole cattle from a ranch in Douglas County. He transported the cattle to Grant County and on to Okanogan County, where he tried to sell the cows at auction. The State prosecuted Howell in Okanogan County. After a guilty verdict, the trial court arrested judgment because the State had failed to prove venue in Okanogan County since the theft occurred in Douglas County. This court reversed and held that venue could include a county to which Howell transported the cattle since the criminal statute covered the conduct of transporting, concealing, and withholding the cattle. Although this court focused on the concept of venue, we also held that the prosecution in Okanogan County did not violate the Washington constitution's vicinage provision.

*State v. Ashe* and *State v. Howell* possess a critical distinction from the prosecution of Denis Mulamba. Harvey Howell and Leo Ashe committed one crime that constituted

a series of related acts. Although the State charged Mulamba with only one count of assault against Stanley, one count of assault against Jane, one count of criminal mistreatment against Stanley, and one count of criminal mistreatment against Jane, he engaged in distinct acts of assault separated by time and place and he failed to procure medical treatment on distinct occasions. The State told the jury that it could convict Mulamba if it found him guilty of only one of several distinct assaults and one of the assaults could have occurred in Grant County, not Kittitas County. Neither party cites the court to any decision that addresses vicinage when multiple criminal acts occurred in different counties.

Denis Mulamba argues that the state high court's ruling in *City of Bothell v. Barnhart*, 172 Wn.2d 223, 257 P.3d 648 (2011) demands automatic reversal. The city of Bothell charged James Barnhart, in Bothell Municipal Court, with stalking. Although Bothell encompasses portions of both Snohomish County and King County, the alleged stalking occurred entirely within Snohomish County. Pursuant to RCW 2.36.050, the Bothell Municipal Court drew its jury panel from Bothell, regardless of the county in which jurors resided. Thus, the jury included two residents of King County and four residents of Snohomish County. The defendant raised a for-cause challenge to the two King County jurors, which challenge the municipal court denied. On appeal, the defendant argued that the impaneling of the King County residents violated article I, section 22 of the Washington Constitution because two jurors were not from Snohomish

County, where he allegedly committed the crime. After considering the plain meaning of "county" in article I, section 22, the Supreme Court held that the municipal court violated the defendant's article I, section 22 rights when the judge impaneled King County jurors over the defendant's objection because the State charged him with a crime only committed in Snohomish County.

Like *State v. Howell* and *State v. Ashe*, *City of Bothell v. Barnhart* does not directly control Denis Mulamba's vicinage claim. In *City of Bothell*, the defendant's alleged conduct was confined to one county, and thus it was improper for individuals from another county to be on the jury. The majority of Denis Mulamba's multiple acts occurred in Kittitas County. No jurors in Denis Mulamba's trial resided in a county where none of Mulamba's conduct occurred.

Denis Mulamba did not assert the vicinage clause before the trial court. A California court has held that the failure to raise proper vicinage at trial waives any violation of the right. *People v. Gbadebo-Soda*, 38 Cal. App. 4th 160, 170-71, 45 Cal. Rptr. 2d 40 (1995).

We deny Denis Mulamba's personal restraint petition on the basis of art. 1 § 22's vicinage requirement for several reasons. First, the Washington law of the vicinage requirement is underdeveloped and Mulamba cites no case that holds that the constitutional provision is violated if some of the alleged multiple criminal acts occurred in another county.

Second, Denis Mulamba does not contend that he received an unfair trial as a result of Kittitas County jurors hearing charges based on conduct in Grant County. We also know no reason why Grant County jurors would be more sympathetic to his defense of the prosecution than would Kittitas County jurors. Along these lines, vicinage is not a right that is fundamental and essential to the purpose of the constitutional right to jury trial. *Price v. Superior Court*, 25 Cal. 4th 1046, 1048. Thus, Mulamba has not established a constitutional error that resulted in actual and substantial prejudice, a prerequisite to our granting a personal restraint petition. *In re Personal Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).

Third, although there may lack continuity between the various assaults, the two victims remained the same in each county. Mulamba resided in Ellensburg, the county seat of Kittitas County. Many professional witnesses resided in Kittitas County. Mulamba was not inconvenienced by a trial of all charges in Kittitas County. One court has noted that repeat victims and witnesses to crimes should not be required to testify in two trials in different counties when the same defendant committed the crimes. *Price v. Superior Court*, 25 Cal. 4th 1046, 1055 (2001).

Fourth, Mulamba has not explained how a favorable ruling would further the purposes behind the vicinage constitutional provision. Fifth, Mulamba may have waived the right to challenge vicinage by failing to assert the vicinage rule at trial.

27

Denis Mulamba cites, in his petition, the vicinage provision in the Sixth Amendment to the United States Constitution, which affords the accused the right to an "impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Nevertheless, Mulamba provides no analysis as to the application of this federal constitutional provision.

The "district" mentioned in the Sixth Amendment is the district established by Congress for United States district courts. *United States v. Grisham*, 63 F.3d 1074, 1079 (11th Cir. 1995). Both Kittitas County and Grant County lie within the same state and the same federal judicial district, the Eastern District of Washington. Anyway, courts universally hold that the vicinage clause of the Sixth Amendment does not apply to state court prosecutions. *Stevenson v. Lewis*, 384 F.3d 1069, 1071-72 (9th Cir. 2004); *Caudill v. Scott*, 857 F.2d 344, 345-46 (6th Cir. 1988); *Cook v. Morrill*, 783 F.2d 593, 595-96 (5th Cir. 1986); *People v. Gayheart*, 285 Mich. App. 202, 776 N.W.2d 330, 345 (2009); *Price v. Superior Court*, 25 Cal. 4th 1046, 1069 (2001); *Garza v. State*, 974 S.W.2d 251, 259 (Tex. App. 1998); *People v. Pascarella*, 92 Ill. App. 3d 413, 417-18, 415 N.E.2d 1285, 48 Ill. Dec. 1 (1981).

Denis Mulamba also claims his trial counsel performed ineffectively when failing to assert the vicinage requirement. We reject this argument principally because Mulamba shows no prejudice by reason of any failure. Mulamba does not even argue prejudice. A defendant claiming ineffective assistance of counsel bears the burden of establishing that

28

counsel's performance was deficient and that the deficient performance resulted in prejudice. *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017). In *People v. Gbadebo-Soda*, 38 Cal. App. 4th 160 (1995), the California court ruled that trial counsel was not ineffective per se by failing to raise vicinage as a defense.

## *Brady* Materials

After trial, Denis Mulamba obtained, through a public records request, Ashley Eli's jail records, which revealed that she engaged in disruptive and violent misconduct, attempted suicide, and incurred many jail infractions in the months prior to Mulamba's trial. Her conduct in jail could lead to additional criminal charges. Mulamba contends the State violated *Brady* by failing to disclose the jail records because of their impeaching nature. Alternatively, he contends his trial counsel was ineffective for failing to obtain these records and employ them at trial.

The prosecution holds a duty, under the due process clause, to disclose to the defense both exculpatory evidence and impeachment evidence favorable to a criminal defendant. *United States v. Bagley*, 473 U.S. 667, 676-77, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The law labels the information and records covered under this duty to disclose as *Brady* material after the United States Supreme Court's landmark decision in *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* rule departs from a pure adversary model of litigation and recognizes that the prosecuting attorney acts, not as counsel for an ordinary

29

party to a controversy, but as the representative of a sovereign whose interest in a criminal prosecution is not one of winning the case, but ensuring that justice prevails. *Brady v. Maryland*, 373 U.S. at 87-88.

To establish a *Brady* violation, a defendant must demonstrate the existence of each of three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching, (2) the evidence must have been suppressed by the State, either willfully or inadvertently, and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *State v. Mullen*, 171 Wn.2d 881, 895, 259 P.3d 158 (2011). For convenience sake, we label the three elements as the "favorable," "suppressed," and "prejudice" prongs. We address each element separately. The State, in response to Denis Mulamba's petition, does not explicitly address the first two of the *Brady* bunch of elements. We analyze each anyway.

This court's review of *Brady* claims involves a mixed question of fact and law. *State v. Davila*, 184 Wn.2d 55, 74, 357 P.3d 636 (2015). The first two *Brady* factors of favorable and suppressed evidence are factual questions. *In re Personal Restraint of Stenson*, 174 Wn.2d 474, 488, 276 P.3d 286 (2012). Nevertheless, because the trial court has not addressed the factors of favorability and suppression, we have no trial court findings to which to defer. The third *Brady* factor of prejudice is a question of law and fact. *In re Personal Restraint of Stenson*, 174 Wn.2d at 488. But the court reviews de

novo the ultimate constitutional question of whether the State's failure to disclose certain information resulted in a due process violation. *State v. Davila*, 184 Wn.2d at 75. Because of the federal constitution underpinnings of the *Brady* rule, we rely extensively on United States Supreme Court and federal appellate court decisions.

*Favorable Evidence*

Under *Brady,* the prosecution has a duty to seek out exculpatory and impeaching evidence held by government actors and to forward the evidence to the defense. *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Oddly the *Brady* rule only requires disclosure of information and records favorable to the defense. An exacting defense attorney would also wish to learn damning information in order to better respond to the harmful evidence during trial.

In his personal restraint petition, Denis Mulamba focuses on Ashley Eli's Kittitas County jail records as impeachment, not exculpatory, material. Impeachment evidence falls within the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The jury's estimate of the truthfulness and reliability of a given witness may determine guilt or innocence, and a defendant's life or liberty may depend on such subtle factors as the possible interest of the witness in testifying falsely. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

Denis Mulamba highlights Ashley Eli's agreement to turn State's witness and the importance of Eli's testimony to the State. As a result of testifying, Eli reduced her

possible sentence by five years. She did not expressly agree with the State to tell the truth, but rather to testify consistently with a story that implicated Mulamba. The State does not deny that Ashley Eli's jail records implicated her credibility and favored Denis Mulamba.

If the State's case depends on the testimony of a cooperating witness, the State must disclose any information regarding the witness's credibility. *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002). The obligation to disclose information looms of greater importance when the State relies on a cooperating witness who garners immunity in exchange for his or her testimony, since criminals who are rewarded by the government for their testimony are inherently untrustworthy. *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997). Criminals, who are rewarded by the government for their testimony, are inherently untrustworthy, and their use triggers an obligation to disclose material information to protect the defendant from being the victim of a perfidious bargain between the state and its witness. *Carriger v. Stewart*, 132 F.3d at 479; *United States v. Bernal-Obeso*, 989 F.2d 331, 333-34 (9th Cir. 1993). Prosecutors must take all reasonable measures to safeguard the system against treachery, and this responsibility includes the duty to deliver to the defense in discovery *all* material information casting a shadow on a government witness's credibility. *United States v. Bernal-Obeso*, 989 F.2d at 333-34.

32

One category of impeaching evidence is evidence of a plea agreement between the witness and the State. *Benn v. Lambert*, 283 F.3d 1040, 1054-58 (9th Cir. 2002). The State did not withhold information of the agreement, under which the State agreed to reduce charges against Ashley Eli. Nevertheless, we emphasize the plea agreement to show the importance of full access to impeachment material concerning Eli.

The Kittitas County Corrections Center records establish that Ashley Eli engaged in conduct inside the jail that led to jail infraction notices and could lead to criminal charges. Eli could face prosecution for possession of contraband inside a jail, possession of a weapon inside a jail, escape, resisting restraints, and causing damage to jail property. *Brady* material encompasses unresolved charges and exposure to future criminal charges. *Benn v. Lambert*, 283 F.3d at 1054-58. The State must obtain and disclose information about a cooperating witness's misconduct and her exposure to criminal charges. *Benn v. Lambert*, 283 F.3d at 1054-58. The obligation includes the duty to disclose unresolved criminal charges, whether formally charged or not, since even possible charges that are not being actively prosecuted are subject to cross-examination due to the witness's subjective fear of future prosecution. *United States v. Price*, 566 F.3d 900, 911-14 (9th Cir. 2009); *Blunt v. United States*, 863 A.2d 828, 834-35 (D.C. App. 2004). Evidence that the authorities knew of criminal behavior of the witness but did not prosecute him or her is relevant to show bias. *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002).

33

Therefore, contrary to the dissent's comment, the jail records should not be characterized as simply irrelevant, inadmissible, and collateral impeachment or character evidence.

Other impeaching evidence includes instances of dishonesty and the witness lying. *Benn v. Lamber*t, 283 F.3d at 1054-58. Accordingly, evidence that a State witness lied may be favorable impeachment evidence for *Brady* purposes. *State v. Gregory*, 158 Wn.2d 759, 798, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). An October 26, 2012 note from a jail sergeant declared that Eli could not be trusted because of how she hides, hoards, and "lies." Fox supplemental declaration at 215.

Another category of impeaching evidence is information that the witness suffers from a mental health illness. The government is generally under an obligation to disclose evidence that bears on the credibility of a witness, including evidence of poor mental and emotional health that may be provable on cross-examination. *United States v. Pryce*, 291 U.S. App. D.C. 84, 938 F.2d 1343, 1345-46 (D.C. Cir. 1991). The State must reveal psychiatric evidence raising questions about the witness's biases and the reliability of his or her testimony. *Fuentes v. Griffin*, 829 F.3d 233, 248 (2d Cir. 2016). The prosecution must disclose its witness's mental health history. *Fuentes v. Griffin*, 829 F.3d at 248; *Browning v. Trammell*, 717 F.3d 1092, 1105-06 (10th Cir. 2013). Evidence that impeaches the witness's ability to recollect or perceive events is relevant. *Benn v.*

*Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002); *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991).

*Government Withholding*

Denis Mulamba must also show that the State either willfully or inadvertently suppressed such evidence. "Suppression," "withholding," and "failure to disclose" hold the same meaning for *Brady* purposes. *Benn v. Lambert*, 283 F.3d at 1053 (9th Cir. 2002). Since all *Brady* material is withheld either willfully or inadvertently, the statement of the rule lacks importance. A better statement of the rule would be that the government possesses or has access to the records such that it must divulge the records and information. We could call this second element the "custody" prong. Although the State of Washington does not contend that it did not possess the Kittitas County Corrections Center records, we briefly address this second prong.

The prosecution "suppresses" evidence, for purposes of *Brady*, if others acting on behalf of the government hold the evidence. *Strickler v. Greene*, 527 U.S. 263, 283 n.23 (1999); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *In re Personal Restraint of Lui*, 188 Wn.2d 525, 565, 397 P.3d 90 (2017); *State v. Lord*, 161 Wn.2d 276, 292, 165 P.3d 1251 (2007). *Brady* does not permit the government to divide itself into separate entities for purposes of records custody. *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984). The *Brady* duty recognizes that the prosecution sits in a unique position to obtain information

35

known to other agents of the government. *Kyles v. Whitney*, 514 U.S. at 438-40; *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997)

Information known to the police must be disclosed. *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391-92 (7th Cir. 1985). In *State v. Davila*, 184 Wn.2d at 71 (2015), our high court held that information concerning a crime laboratory employee fell under *Brady*. In one federal case, the court even faulted the government for failing to provide the personnel file for a key witness who worked for the United States Postal Service. *United States v. Deutsch*, 475 F.2d 55 (5th Cir. 1973).

Courts consistently hold that the prosecuting attorney must disclose the jail records of a cooperating witness. *United States v. Price*, 566 F.3d 900, 913 (9th Cir. 2009); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997); *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995). In *United States v. Burnside*, 824 F. Supp. 1215, 1252, 1254 (N.D. Ill. 1993), the court ruled that the knowledge of the corrections center warden, among other officers, was imputed to the government for purposes of *Brady*.

Denis Mulamba argues that the prosecuting attorney's office had knowledge of the conduct of Ashley Eli inside the Kittitas County jail. We deem what, if any, knowledge the State's attorney gained to be irrelevant. Because the jail was a government actor, the jail's knowledge and records are deemed within the custody of the State and its counsel. The good faith or bad faith of the State is irrelevant when material impeachment evidence is withheld from the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The State suggests that Denis Mulamba, before trial, could have garnered the jail records or interviewed Ashley Eli and determined her mental condition, such that it lacked any obligation to volunteer the information. In turn, the State focuses on whether defense counsel was ineffective for failing to request or obtain the jail records. Washington decisions may support this argument. Along with the defense, the dissent suggests that Ashley Eli's jail records were available to Denis Mulamba because Eli was his co-defendant. Nevertheless, Eli was not a co-defendant in the same prosecution. We also are unaware of any rule that automatically makes available, to an accused, a co-defendant's mental health and jail records.

According to Washington decisions, evidence that could have been discovered but for lack of due diligence by the defense is not a *Brady* violation. *State v. Lord*, 161 Wn.2d 276, 293 (2007); *State v. Gregory,* 158 Wn.2d 759, 798 (2006); *State v. Thomas*, 150 Wn.2d 821, 851, 83 P.3d 970 (2004); *In re Personal Restraint of Gentry*, 137 Wn.2d 378, 396, 972 P.2d 1250 (1999); *In re Personal Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998).

Federal decisions conflict with the State's argument. According to federal courts, the State does not avoid its obligation of disclosure based on defendant's knowledge of and ability to interview the witness and obtain the undisclosed material. *Benn v. Lambert*, 283 F.3d 1040, 1061 (9th Cir. 2002). The duty to disclose applies regardless of whether defense counsel requested the information. *United States v. Bagley*, 473 U.S.

37

667, 683 (1985); *United States v. Agurs*, 427 U.S. 97, 106-07, 96 S. Ct. 2392, 49 L. Ed.

2d 342 (1976); *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002). Due process

obligates the prosecution to disclose material exculpatory evidence on its own motion,

without request. *Kyles v. Whitley,* 514 U.S. 419, 432-34 (1995); *United States v. Bagley,*

473 U.S. at 682. We must follow the United States Supreme Court decisions, not

Washington Supreme Court decisions, with regard to federal constitutional questions.

*Chesapeake & Ohio Railway Co. v. Martin*, 283 U.S. 209, 221, 51 S. Ct. 453, 75 L. Ed.

983 (1931). If the defense has no obligation to ask for records before *Brady* disclosure

arises, defense counsel has no obligation to search for the information on his or her own.

In turn, the records' availability to both sides lacks importance.

One of the Washington Supreme Court decisions holding that defense counsel

must devote reasonable efforts to discover favorable evidence is *In re Personal Restraint*

*of Benn*, 134 Wn.2d 868 (1998). We observe that the Ninth Circuit Court of Appeals

granted Gary Benn a writ of habeas corpus, after the Washington Supreme Court denied

Benn's personal restraint petition. *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002). The

Ninth Circuit held that the Washington Supreme Court's ruling entailed an unreasonable

application of United States Supreme Court law.

Denis Mulamba's personal restraint petition counsel obtained the jail records

through a public disclosure request. Nevertheless, the availability of records through a

public records request does not alleviate or excuse the government of its affirmative duty

38

to learn of and disclose any exculpatory or impeachment evidence known to the prosecution or others working on its behalf. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *In re Personal Restraint of Lui*, 188 Wn.2d 525, 567 (2017).

After writing that the jail records were equally available to both sides, the dissent writes that records were not available to either party. In support of the latter proposition, the dissent cites 42 U.S.C.A. § 1320d-6, a portion of the Health Insurance Portability and Accounting Act of 1986 (HIPAA), 42 U.S.C. §§ 1320d to 1320d-8, and RCW 70.02.020. This contention fails to note that all of the records withheld by the State were jail records, only some of which were prepared by mental health experts. We consider records already in the hands of the government to be available to the State. We also deem records already in the possession of the State not to be equally accessible to the accused particularly when the accused is unaware of the existence of the records.

If another law compels disclosure of health records, the privacy protections afforded under the Health Insurance Portability and Accounting Act yield to permit disclosure of the records. 45 C.F.R. § 164.512(a)(1); *Protection & Advocacy System, Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1217 (D. Wyo. 2006); *Ohio Legal Rights Service v. Buckeye Ranch, Inc.,* 365 F. Supp. 2d 889-90 (S.D. Ohio 2005). A constitutional prescription demanding disclosure of impeaching mental health records of a jail inmate must then override 42 U.S.C. § 1320d-6. Many of the cases we discuss involve the withholding of medical or psychiatric records.

RCW 70.48.100(2) directs a jail to hold in confidence records of a jail inmate. Just as the due process clause prevails over HIPAA, constitutional dictates demanding disclosure of records prevail over a Washington statute rendering records confidential.

At the very least, the State should have notified Denis Mulamba of its possession of the mental health records so that Mulamba could have taken steps to subpoena the records. In the alternative, the State should have notified the court and counsel of the existence of the records and permitted the trial court to engage in an in camera review to determine any privilege. *Fuentes v. Griffin*, 829 F.3d 233, 241 (2d Cir. 2016), *United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995). In *Browning v. Trammell*, 717 F.3d 1092, 1095 (10th Cir. 2013), the appellate court ruled that, if any difficulty arises because of an evidentiary privilege, such as the psychotherapist-patient privilege, the trial court should review the records in camera to determine whether *Brady* dictates a disclosure.

*Materiality*

Courts have announced vague and contradictory standards for determining whether a *Brady* violation prejudiced the accused. The United States Supreme Court borrowed the confusing terminology from the law of ineffective assistance of counsel. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Application of this third prong poses the most difficult decision for us in resolving Denis Mulamba's personal restraint petition in part because of the vague and inconsistent standards of prejudice. The difficulty increases

when considering we essentially must assume the role of a juror and weigh evidence to determine the importance of the information found in the jail records when juxtaposed with the evidence presented by the parties at trial.

In the context of the third *Brady* prong, "materiality" and "prejudicial" mean the same. Evidence is not material unless it is prejudicial and not prejudicial unless it is material. *Benn v. Lambert*, 283 F.3d 1040, 1053, n.9 (9th Cir. 2002).

Evidence is material and must be disclosed by the State if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667, 679-80 (1985). The result of the proceeding would not be different unless the accused would have gained an acquittal or at least a hung juror. Therefore, under this principle of reasonable probability, the law should require the accused to establish that more likely than not the jury's consideration of the withheld *Brady* material would have led to an acquittal. Nevertheless, the courts do not require this exacting standard of proof.

Under *Brady* doctrine, a "reasonable probability" does not require showing by a preponderance that the jury would have acquitted the accused if the government had disclosed the suppressed evidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. at 681-82; *State v. Davila*, 184 Wn.2d at 73 (2015). Instead, he or she must show only that the government's evidentiary suppression "undermines

confidence" in the outcome of the trial keeping in mind that the jury must find guilt beyond a reasonable doubt. *Wearry v. Cain*, ___ U.S. ___, 136 S. Ct. 1002, 1006, 194 L. Ed. 2d 78 (2016); *United State v. Bagley*, 473 U.S. at 678. We grant relief when we no longer hold confidence that the jury would have convicted after hearing the additional testimony. *Wearry v. Cain*, 136 S. Ct. at 1007.

Some Washington case law may conflict with federal decisional law with regard to the standard of materiality. Under United States Supreme Court precedent, the accused need not establish a likelihood of a different outcome. *Kyles v. Whitley*, 514 U.S. 419, 434. Instead, the court should vacate the verdict if it lacks confidence in the verdict, which means the court may reverse even if the court believes the defendant is guilty or expects the jury to convict again after hearing the withheld evidence. In other words, the court may grant a new trial if the court deems the suppressed material possibly, rather than probably, could have changed the verdict. But Washington Supreme Court decisions stand for the principle that the *mere possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *In re Personal Restraint of Lui*, 188 Wn.2d 525, 566 (2017); *State v. Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (1986); *State v. Knutson*, 121 Wn.2d 766, 773, 854 P.2d 617 (1993). One might wonder, based on Washington precedent, if a "mere possibility" differs from a "possibility," and whether the reviewing court should afford relief if there is a "possibility," but not a "mere

possibility," of a different outcome. If so, the court would struggle between what constitutes a "mere possibility" as opposed to a "possibility."

Since we are bound by United States Supreme Court precedent, we do not follow the principle of "mere possibility" announced by the Washington Supreme Court. At least one federal court based on language from United States Supreme Court decisions has abandoned the term "reasonable probability" and written that reversal is required when there is a "reasonable possibility" that the error materially affected the verdict. *United States v. Goldberg*, 582 F.2d 483, 489-90 (9th Cir. 1978).

In recognition of the fact that one juror could cause a mistrial or convince all other jurors to acquit, some courts apply a test of whether there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment of the cooperating witness. *Cone v. Bell*, 556 U.S. 449, 452, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009); *United States v. Kohring*, 637 F.3d 895, 906 (9th Cir. 2011); *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009). Even under Washington Supreme Court precedent, the court should ask whether a single juror likely would have had reason to doubt the State's evidence if the jury had heard all evidence at trial. *In re Stenson*, 174 Wn.2d 474, 493 (2012). One might guess as to whether, in this context, "reasonable probability" means a reasonable possibility of shaken confidence of guilt in one juror.

We review some other principles of *Brady* materiality. When determining materiality, the court reviews suppressed evidence collectively, not item by item. *Kyles*

43

*v. Whitney*, 514 U.S. 419, 436 (1995). Nevertheless, in doing so, the court must assess the force of the undisclosed evidence item by item in order to evaluate its cumulative effect. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Agurs*, 427 U.S. 97, 112 (1976); *See State v. Davila*, 184 Wn.2d 55, 78-79 (2015). In determining materiality, courts do not distinguish between exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

A reasonable probability of undermined confidence may be found even when the remaining evidence would have been sufficient to convict the defendant. *Strickler v. Greene*, 527 U.S. 263, 290 (1999); *United States v. Kohring,* 637 F.3d 895, 902 (9th Cir. 2011). Materiality is not a sufficiency of the evidence test. A defendant need not disprove that, after discounting the inculpatory evidence in light of the undisclosed evidence, enough evidence remains to convict. *Kyles v. Whitley*, 514 U.S. 419, 434-35, (1995). Instead, the defendant must show the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 435; *Browning v. Trammell*, 717 F.3d 1092, 1094-95 (10th Cir. 2013).

In response to Denis Mulamba's personal restraint petition, the State contends that the jail records lack materiality because neither the records nor the information about Ashley Eli's conduct would be admissible. The State also contends that the information

would be cumulative to impeaching evidence that Denis Mulamba actually presented at trial. We address both admissibility and cumulativeness.

One court disagrees with the principle requiring admissibility and mentioned that the evidence need not have been independently admissible to have been material. *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997). The court did not explain further this statement, but perhaps the court believed that the State should disclose information if the revealed information could lead to admissible evidence, a standard similar to the discovery standard in civil suits. We assume, for arguments sake, that the jail records or information in the records must be admissible to be material.

To be material under *Brady*, undisclosed information must be admissible. *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989); *State v. Cardenas*, 146 Wn.2d 400 413, 47 P.3d 127 (2002). We already addressed the dissent's suggestion that the jail records would not be admissible because of their confidential nature.

The State, while conceding that the jail records might have some relevance, contends the records would be inadmissible. But the State presents little analysis as to the records' admissibility. In forwarding the argument about admissibility, the State emphasizes the information surrounding Ashley Eli's mental health. We question, as does the State, whether some of the evidence concerning Ashley Eli's mental health inside the jail, would be admissible at trial.

45

Courts will not necessarily allow into evidence nonprofessional opinions or observations of a witness's mental health. *United States v. Butt*, 955 F.2d 77, 82 (1st Cir. 1992). In *United States v. Kohring*, 637 F.3d 895, 910-11 (9th Cir. 2011), the court excused the government from releasing a FBI agent's informal mental health assessment of the witness. Also, evidence of depression and a suicide attempt are not necessarily admissible. *United States v. Butt*, 955 F.2d 77, 82-83.

Courts will, however, allow testimony by qualified mental health professionals. In *United States v. Smith*, 316 U.S. App. D.C. 199, 77 F.3d 511 (D.C. Cir. 1996) and *United States v. Pryce*, 291 U.S. App. D.C. 84, 938 F.2d 1343 (D.C. Cir. 1991), the federal courts noted the admissibility and importance to impeachment of a government witness of psychiatric reports and medical records of the witness that show characteristics of the inability to testify accurately. In *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995), the court wrote that evidence of a witness's psychological history may be admissible when it goes to her credibility. In assessing the probative value of such evidence, the court should consider such factors as the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately. *United States v. Sasso*, 59 F.3d at 347-48.

In *Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016), the Second Circuit held that the prosecutor committed a *Brady* violation when it failed to disclose that the victim underwent a psychiatric consultation when hospitalized for the rape at issue and the examination disclosed that she reported depression and substance abuse. The court observed that United States Supreme Court rulings recognize the application of *Brady* principles to a witness's psychiatric records.

In *Browning v. Trammell*, 717 F.3d 1092, 1105-06 (10th Cir. 2013), the reviewing court also ruled that the government violated *Brady* principles when withholding psychiatric records of an important witness in a heinous murder. The court emphasized that the records showed that the witness blurred reality and fantasy. Nevertheless, the court also deemed records that showed the witness to be combative and assaultive important.

The jail records documenting Ashley Eli's behavior and mental health generally consist of informal notes by Kittitas County jail personnel and contact summaries from Central Washington Comprehensive Mental Health (CWCMH). Staff members of CWCMH signed the mental health entity's notes, but we do not know if these staffers were physicians or licensed mental health professionals. The jail records may echo the informal FBI assessment the *Kohring* court concluded was not relevant to a witness's mental instability rather than the formal psychiatric evaluations in other decisions. The jail records indicate that Ashley Eli suffered from depression, engaged in bizarre

behavior, and attempted suicide, but the records do not confirm that Eli suffered from a mental illness that impaired her ability to accurately perceive the events giving rise to the prosecution of Denis Mulamba or to testify correctly at trial.

We issue no decision as to the admissibility, during retrial, of the notes about Eli's mental health. The trial court, on remand, should decide the relevance and admissibility of evidence surrounding the mental stability of Ashley Eli.

When arguing that the jail records are inadmissible, the State ignores the fact that, in one of the jail notes, a jail sergeant documented Eli's history of hiding and lying. Courts recognize that the defense may introduce evidence of the cooperating witness lying to authorities. *Benn v. Lambert*, 283 F.3d 1040, 1054-58 (9th Cir. 2002); *State v. Gregory*, 158 Wn.2d 759, 798 (2006). In *State v. Gregory*, the court held that evidence in a child dependency file indicating the victim lied about a recent drug relapse in an interview was material impeachment evidence.

The jail records also show criminal behavior on the part of Eli without any indication of the State taking steps to prosecute for the conduct. ER 608(b) allows a party to introduce evidence of specific instances of conduct of a witness, other than criminal convictions, to attack the witness's credibility. Alleged misconduct, even when no charges have been filed, is impeaching evidence under *Brady*. *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002). The dissent fails to recognize the relevance of criminal behavior inside the jail of a cooperating witness and the State's failure to prosecute the

48

witness for the crimes. Ashley Eli's lies to jail authorities and the jail's withholding of punishment of Eli within weeks of her testimony at trial looms of more importance than a witness having lied to a teacher forty years earlier about homework, the analogy presented by the dissent.

The State also contends the jail records would be cumulative to all of the negative testimony the jury heard regarding Ashley Eli. The only negative testimony identified by the State is the showing that Eli received a plea deal in exchange for her testifying against Denis Mulamba. We note, however, that on cross-examination, Eli admitted lying once to an officer who interviewed her about her children's injuries.

We face, on the surface, contradictory principles concerning the materiality of seemingly cumulative impeachment evidence. On the one hand, if suppressed evidence is "merely cumulative," the failure to disclose is not a violation. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006). Undisclosed impeachment evidence is immaterial and cumulative when the witness is already sufficiently impeached. *United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995); *Ortiz v. Stewart*, 149 F.3d 923, 936 (9th Cir. 1998); *State v. Early*, 70 Wn. App. 452, 463, 853 P.2d 964 (1993). On the other hand, the State cannot satisfy its *Brady* obligation to disclose exculpatory and impeachment evidence by making some evidence available and asserting that the rest would be cumulative. *Benn v. Lambert*, 283 F.3d 1040, 1057-58 (9th Cir. 2002).

Before declaring evidence cumulative, the reviewing court should not automatically conclude that, if the defense impeached the witness at trial, additional impeaching evidence would be immaterial. Some evidence of bias does not diminish the value of other impeachment evidence emanating from a different source of bias. *Banks v. Dretke*, 540 U.S. 668, 702-03, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *Napue v. Illinois*, 360 U.S. at 270; *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005). In *United States v. Kohring*, 637 F.3d 895, 904 (9th Cir. 2011), the court noted that the cooperating witness's additional misconduct undisclosed to the defense would have shed light on the magnitude of the witness's incentive to cooperate with authorities and would have revealed that he had much more at stake than was already known to the jury.

In one decision, the reviewing court noted that the jury heard evidence about a critical witness incurring a criminal conviction, but still convicted the defendant. *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002). In this instance, the impeaching evidence was insufficient to persuade the jury. Therefore, the suppressed impeachment evidence takes on greater importance and should not be considered cumulative. *Benn v. Lambert*, 283 F.3d 1040, 1055. One piece of withheld evidence could be the tipping point for one juror to find the cooperating witness untruthful and thereby vote to acquit.

When assessing the materiality of withheld *Brady* discovery, the reviewing court should keep an awareness of the difficulty of reconstructing, in a post-trial proceeding, the course that the defense and the trial would have taken had the State disclosed all

impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 683 (1985). The private whys and wherefores of jury deliberations pose an impenetrable barrier to a court's ability to know just which piece of information might make, or might have made, a difference in the trial outcome. *United States v. Bagley*, 473 U.S. at 693 (Marshall, J. dissenting). Presumably the United States Supreme Court justices mentioned the difficulty of assessing the thought processes of twelve jurors individually and collectively to encourage lower courts to give the defense the benefit of the doubt as to the materiality of *Brady* material, not to encourage lower courts to affirm convictions out of an inability to determine if the jury would have still convicted with the additional evidence.

Washington courts have issued conflicting decisions. In *State v. Early*, 70 Wn. App. 452, 463 (1993), this court determined that the State's failure to disclose impeaching evidence about a victim was not material when the jury was informed of the victim's prior convictions, and two witnesses presented evidence suggesting the witness was untruthful, and thus the picture of the witness "as an unsavory character with a motive to lie was amply painted for the jury."

In contrast, in *State v. Gregory*, 158 Wn.2d 759 (2006), the high court found the fact that a witness lied to defense counsel about the last time she used drugs was material, even though the witness was questioned about five prior theft convictions, giving false names to police, and her use of drugs on the day of the attack. In *Gregory*, the new impeachment evidence was not merely cumulative because it undercut any argument that

51

the witness had reformed her old ways, and the State repeatedly emphasized during closing that the outcome of the prosecution hinged on whom the jury found more credible.

After reviewing the trial testimony, after analyzing the facts contained in the withheld *Brady* material, and after perusing the summations of counsel to the jury, we conclude that the suppressed jail records are material in that they undermine our confidence in the jury verdict. The State presented strong evidence of guilt of Denis Mulamba on all four charges. Nevertheless, *Brady* evidence need not prove a defendant's innocence. *Kyles v. Whitley*, 514 U.S. 419, 435, 453 (1995); *Browning v. Trammell*, 717 F.3d 1092, 1108 (10th Cir. 2013). The additional impeaching evidence, within the realm of reasonable possibility, if not probability, could have influenced a juror's view of the credibility of the State's primary, if not critical witness, Ashley Eli.

The Kittitas County Corrections Center records demonstrated that Ashley Eli likely suffered from mental illness in the weeks leading to her testimony and engaged in dishonest, violent, and destructive behavior. She repeatedly lied to jail officials. Her behavior amounted to the crimes of assault, escape, resisting restraint, and damaging government property. She could have been charged with a series of crimes based on her persistent misbehavior such that Eli was motivated to testify favorably to the State in addition to the benefits of the plea bargain. But the jury never heard this evidence. The jail records would assist Denis Mulamba in arguing that the mentally unstable and lying

52

Ashley Eli, not him, injured the two children. After all, during the trial, the jury also heard testimony of spankings and gagging of the children by Eli. The records would also assist Mulamba in contending that, even if he punished the children on occasion, Eli meted the extreme punishment that led to the injuries qualifying the conduct as first and second degree assault of a child.

Ashley Eli's credibility was important to the outcome of the trial. The defense argued she was "nuts," while the State argued "there's a stream of evidence and truth that flows through her testimony." RP at 1084. A factor to consider is the extent to which the State advocated the truthfulness of the cooperating witness. For example, in *Carriger v. Stewart*, 132 F.3d 463, 482 (9th Cir. 1997), the federal Court of Appeals deemed withheld impeaching evidence material in part because the prosecutor told the jury that the government's chief witness "is a lot of things but he is not a liar."

We note that the State also presented testimony from Jane and Stanley that generally supported Eli's version of events and that Denis Mulamba was the one who hurt them. Nevertheless, Jane gave no descriptions of her injuries. During closing, the State's attorney emphasized iron burns on Jane as egregious assaults that could constitute the crime of conviction for first degree assault, yet no one testified that Mulamba burned Jane with the iron. Stanley confirmed that Mulamba assaulted him and his sister. Nevertheless, Eli had influenced the statements of the children before and the record does

not indicate what contact, if any, Eli had with the children in the weeks preceding the trial. Eli presented more detailed testimony than the children.

We also note that Denis Mulamba was able to impeach the credibility of Ashley Eli. He introduced evidence that she received a reduction in her sentence by agreeing to testify that Mulamba caused the children's injuries. He introduced evidence about Eli shaving her head. But the jury did not hear the full extent of the evidence Mulamba could have used to impeach Eli. The jury did not hear about the extensive violent and abusive behavior in the jail and her constant hiding objects and lying to jail officers. Obviously, the jury did not deem the impeaching evidence that Mulamba presented at trial sufficient to taint Eli's credibility. We cannot be certain whether additional impeachment could have influenced a juror's view of Eli's testimony.

When addressing Denis Mulamba's *Brady* claim, the State of Washington wants us to employ the burden imposed on the accused when he seeks a new trial based on newly discovered evidence. Nevertheless, the reasonable probability standard for obtaining relief from a *Brady* violation is less onerous than the probably would have resulted in acquittal standard for newly discovered evidence. *United States v. Agurs*, 427 U.S. 97, 109-11 (1976). If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in an neutral source, there would be no significance to

the prosecutor's obligation to serve the cause of justice. *United States v. Agurs*, 427 U.S. 97, 111.

Generally, after finding a constitutional violation, a reviewing court engages in a harmless error analysis. Nevertheless, if the court finds all three factors of the *Brady* analysis satisfied, the court does not engage in a separate harmless error analysis. *Kyles v. Whitney*, 514 U.S. 419, 435 (1995); *State v. Davila*, 184 Wn.2d 55, 73 (2015). When an appellate court determines that exculpatory evidence is "material" under *Brady*, the court also determines that, had the defense been able to present the evidence to the jury, a juror might have had a reasonable doubt as to guilt. *United States v. Agurs*, 427 U.S. 97, 112-13 (1976). If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. *In re Personal Restraint of Stenson*, 174 Wn.2d 474, 493-94 (2012).

Denis Mulamba brings his *Brady* claim in the context of a personal restraint petition. Most decisions that hold constitutional error occurred when the State withheld evidence entail a writ of habeas corpus or a personal restraint petition. The courts spend little time addressing whether the accused meets the additional burden attending to a collateral attack on a conviction when the court holds the *Brady* evidence to be material. On the same basis that we find materiality and prejudice under a *Brady* analysis, we hold that Mulamba has shown a constitutional error that resulted in actual and substantial prejudice.

Denis Mulamba also contends that the State's failure to provide jail records denied him the constitutional right to confront witnesses. He further argues that his trial counsel performed ineffectively by failing to procure the records before trial. Since we grant him a new trial on the basis of the due process clause, we do not address the confrontation or assistance of counsel clauses.

Finally, Denis Mulamba argues that the *Brady* material would have been relevant to his sentencing. We need not address this contention.

## Jury Unanimity

Although we reverse all four of Denis Mulamba's convictions, we address his jury unanimity assignment of error because of the potential for repetition. Mulamba contends that jury instructions 13 and 17 violated his constitutional right to a unanimous jury verdict because the instructions did not require the jury to universally agree on one discrete act that respectively constituted an assault of Jane and of Stanley.

Denis Mulamba never objected, at trial, to the delivery of jury instructions 13 and 17. Nevertheless, any error based on the need for jury unanimity rises to constitutional magnitude and may be raised for the first time on appeal. *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991), *abrogated on other grounds by In re Personal Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002), which in turn was superseded by statute; *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). In *State v. Kitchen*, a

decision combining three prosecutions, one defendant successfully raised a jury

unanimity error for the first time in a personal restraint petition.

Jury instruction 13 directed the jury to find Denis Mulamba guilty of first degree

assault of a child against Jane if it found beyond a reasonable doubt that, between the

inclusive dates of January 13, 2012 and January 29, 2012, Mulamba:

> (a) committed the crime of Assault in First Degree  against [Jane]; or
> (b) intentionally assaulted [Jane] and recklessly inflicted great bodily
> harm on her, or
> (c) intentionally assaulted [Jane] and caused substantial bodily harm
> and [Mulamba] had [either] previously engaged in a pattern or practice of
> assaulting [Jane] which had resulted in bodily harm that was greater than
> transient physical pain or minor temporary marks or had caused [Jane]
> physical pain or agony equivalent to that produced by torture.

PRP, Exhibit 9 at 36.  Note that the jury instruction presented four alternative means by

which the jury could convict Mulamba of the crime: (1) he committed first degree

assault, which constitutes assaulting another and inflicting great bodily harm, while

intending to inflict the great bodily harm, (2) he intentionally assaulted Jane and

recklessly inflicted great bodily injury, (3) he intentionally assaulted Jane, caused her

substantial bodily injury, and previously engaged in a pattern or practice of assault

against Jane, or (4) he intentionally assaulted Jane, caused her substantial bodily injury,

and caused pain equivalent to torture.  But Mulamba does not contend on appeal that the

jury needed to be unanimous as to the means by which Mulamba committed first degree

assault of a child.  Instead, Mulamba emphasizes that at least the first two alternative

means required the jury to find one act of assault, and, because the jury heard evidence of

multiple acts, each member of the jury needed to find that he committed the same exact

act. To preserve his right to a unanimous jury, even the third and fourth alternative

means might have required a finding of one particular predicate act of assault before the

jury determined if Mulamba engaged in a pattern of assault or torture.

Jury instruction 17 directed the jury to find Denis Mulamba guilty of second

degree assault of a child against Stanley if it found beyond a reasonable doubt that,

between the inclusive dates of January 13 and 29, 2012, Mulamba:

> (a) committed the crime of Assault in the second degree against
> [Stanley], or
> (b) intentionally assaulted [Stanley] and caused bodily harm that was
> greater than transient physical pain or minor temporary marks, and
> [Mulamba] had previously engaged in a pattern or practice of assaulting
> [Stanley], which had resulted in bodily harm that was greater than transient
> physical pain or minor temporary marks or had caused [Stanley] physical
> pain or agony equivalent to that produced by torture.

PRP, Exhibit 9 at 40. Jury instruction 17, combined with jury instruction 28, presented

five, rather than four, alternative means by which the jury could convict Mulamba of the

crime of second degree assault: (1) he committed second degree assault by intentionally

assaulting Stanley and recklessly inflicting substantial bodily harm, (2) he committed

second degree assault by assaulting Stanley with a deadly weapon, (3) he committed

second degree assault by knowingly inflicting bodily harm on Stanley and thereby caused

pain equivalent to torture, (4) he intentionally assaulted Stanley and caused bodily harm

and more than transient physical pain, while having previously engaged in a pattern or practice of assaulting Stanley, or (5) he intentionally assaulted Stanley and caused bodily harm and physical pain equivalent to that produced by torture. Again, Mulamba does not contend on appeal that the jury needed to be unanimous as to the means by which he committed second degree assault of a child. Instead, Mulamba argues that each juror needed to agree on the alleged act of assault that the State proved beyond a reasonable doubt as to the first three, if not all five, alternatives.

RCW 9A.36.120 describes the conduct that constitutes the crime of first degree assault of a child. Jury instruction 13 followed the language of the statute. The statute declares, in relevant part:

> (1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:
> (a) Commits the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child; or
> (b) Intentionally assaults the child and either:
> (i) Recklessly inflicts great bodily harm; or
> (ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture.

RCW 9A.36.130 similarly provides that a person commits the crime of second degree assault of a child when:

(1) A person eighteen years of age or older is guilty of the crime of assault of a child in the second degree if the child is under the age of thirteen and the person:
(a) Commits the crime of assault in the second degree, as defined in RCW 9A.36.021, against a child; or
(b) Intentionally assaults the child and causes bodily harm that is greater than transient physical pain or minor temporary marks, and the person has previously engaged in a pattern or practice either of (i) assaulting the child which has resulted in bodily harm that is greater than transient pain or minor temporary marks, or (ii) causing the child physical pain or agony that is equivalent to that produced by torture.

In response to Denis Mulamba's error assignment, the State of Washington argues that, in an alternative means case, jury unanimity is not required if sufficient evidence supports each of the means presented to the jury. In turn, the State contends that, when viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. Our dissenting brother also analyzes the case as an alternative means case, not a multiple acts case.

As already noted, Denis Mulamba does not seek reversal based on the failure to require jury unanimity for an alternative means crime. Mulamba instead relies on jury unanimity being needed when the State presents evidence of multiple acts, but charges only one count for those acts. An alternative means case differs from a multiple acts case. *State v. Woodlyn*, 188 Wn.2d 157, 162-64, 392 P.3d 1062 (2017); *State v. Crane*, 116 Wn.2d 315, 325-26 (1991), *in turn superseded by statute*; *State v. Kitchen*, 110 Wn.2d 403 (1988); *State v. Petrich*, 101 Wn.2d 566, 570, 683 P.2d 173 (1984) *abrogated*

*on other grounds by State v. Kitchen*, 110 Wn.2d 403 (1988). We issue no ruling that the jury must be unanimous on the means by which each crime occurred. The posture of the prosecution being one entailing alternative means does not preclude the prosecution from also involving multiple acts and demanding a unanimity jury instruction because of the multiple acts. Neither the State nor the dissent cites a decision that shields a case from the need of a unanimity instruction because of multiple acts because the State also charged the accused with alternative means of a crime. The State's failure to recognize that Denis Mulamba grounds his jury unanimity argument on multiple acts impedes its success.

Under the Washington State Constitution, accused have a right to a unanimous jury verdict. CONST. art. 1, §§ 21, 22; *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994); *State v. Petrich*, 101 Wn.2d 566, 569 (1984). The State implicates this right when it charges one count of a crime without identifying one particular act in a distinct time and place as the charged crime, but argues and presents evidence of many distinct acts that could constitute the crime. One juror could find that the State did not prove the existence of one particular act beyond a reasonable doubt and instead find the State proved the existence of another act beyond a reasonable doubt, while the remaining jurors could base their vote solely on the existence beyond a reasonable doubt of the one act the first juror found not to be proved. *State v. Kitchen*, 110 Wn.2d 403, 411 (1988).

One could posit unending variables in the respective jurors', and, in turn, the composite jury's, findings as to what act or acts the State proved beyond a reasonable doubt.

Because of the implication on the accused's constitutional rights, when the evidence indicates that several distinct criminal acts have been committed, but the defendant is charged with only one count of criminal conduct, the State must either elect on which act it relies for conviction or the court must instruct the jury that all twelve jurors must agree that the State proved the same criminal act beyond a reasonable doubt. *State v. Camarillo*, 115 Wn.2d 60, 64, 794 P.2d 850 (1990); *State v. Kitchen*, 110 Wn.2d 403, 409 (1988); *State v. Petrich*, 101 Wn.2d 566, 572 (1984); *State v. Workman*, 66 Wash. 292, 294-95, 119 P. 751 (1911). Washington law labels such a jury instruction as a unanimity instruction or a *Petrich* instruction, the latter name arising from a leading Washington Supreme Court decision. Surprisingly no reported decision records a trial court directing the jury to answer a special verdict form by identifying the act on which it unanimously agreed to convict, but instead trusts the jury to follow the unanimity instruction without naming the act.

As to Jane, the jury heard testimony of many possible assaults committed by Denis Mulamba. The multifarious actions included unspecified punishment on January 14 in the garage at Golden Age Afh in Moses Lake, beating her with a belt at a rest stop between Moses Lake and Ellensburg on January 22, beating her with a belt occasionally during the week of January 23 in Ellensburg, beating her with an electric cord or coaxial

cable at unidentified times, requiring wall sits on three unspecified nights in Ellensburg, beating her when she failed to wall sit for an unspecified period of time in Ellensburg, spanking her on her bottom with a belt on January 26 in Ellensburg, thrashing her with an iron's cord on January 26 in Ellensburg, burning her with an iron on January 26 in Ellensburg, forcing wall sits on January 29 in Ellensburg, and whipping her with a coaxial cable on January 29 in Ellensburg.

As to Stanley, the jury also head evidence of many possible assaults meted by Denis Mulamba. The multiple acts included striking Stanley with a piece of wood and a metal bar on January 22 in Moses Lake, beating him with a belt at a rest stop between Moses Lake and Ellensburg on January 22, walloping him with a belt occasionally during the week of January 23 in Ellensburg, pounding him with an electric cord or coaxial cable at unidentified times and places, requiring wall sits on three unidentified nights in Ellensburg, beating him when he failed to wall sit for an unspecified length of time, repeatedly striking him on the back and legs with a belt at unspecified times and places, spanking him with the cord of a phone charger on the night of January 25 in Ellensburg, whipping him with an iron's cord on January 26 in Ellensburg, and pinching him with pliers on an unspecified date and place.

In addition to proving that a physical battery occurred for each count of assault of a child, the State also needed to prove a particular level of injury and pain to the child victim. The jury could have disagreed as to what acts of Denis Mulamba caused the

requisite injury. Because of the numerous acts that some jurors could have concluded

beyond a reasonable doubt occurred, while other jurors could have concluded that they

did not occur, we hold that Denis Mulamba was entitled to a unanimity instruction.

Despite arguing that Denis Mulamba's petition raises the specter of an alternative

means case, the State contends that, because of a pattern or practice of assaults against

both children, the jury need not have been unanimous as to the commission of one

particular assaultive act. Even assuming the pattern or practice exception applies to

multiple acts cases in addition to alternative means prosecutions, we disagree because the

jury could have convicted Denis Mulamba, under alternatives 1 and 2 of each jury

instruction, without finding any pattern or practice.

Our conclusion is bolstered by the closing argument presented to the jury by the

State's attorney. The prosecuting attorney told the jury that it need not find a pattern or

practice, but could find Denis Mulamba guilty of both first degree assault of a child and

second degree assault of a child based on one predicate act of assault. In turn, State's

counsel outlined some of those acts. The State's attorney presented the jury what he

called "options."

Washington courts recognize that a *Petrich* unanimity instruction is not required

when the State presents evidence of multiple acts that indicate a "continuing course of

conduct." *State v. Crane*, 116 Wn.2d 315, 326 (1991); *State v. Handran*, 113 Wn.2d 11,

17, 775 P.2d 453 (1989). Nevertheless, the concept of a continuing offense must be

distinguished from the presence of several distinct acts, each of which could be the basis

a criminal charge. *State v. Petrich*, 101 Wn.2d at 571. For the conduct to constitute a

continuing course of conduct, the conduct should occur during a "small time frame."

*State v. Crane*, 116 Wn.2d at 330. Generally, evidence that the charged conduct occurred

at different times and places tends to show that several distinct acts occurred rather than a

continuing course of conduct. *State v. Handran*, 113 Wn.2d at 17. Although no court

has limited the breath of time over which a course of conduct may occur, many decisions

based on this rule emphasize that the many acts occurred during the course of hours, not

weeks. *State v. Crane*, 116 Wn.2d at 330; *State v. Monaghan*, 166 Wn. App. 521, 537,

270 P.3d 616 (2012). Also the court must consider the possibility of more than one

distinct continuing courses of conduct, circumstances that would also require a jury

unanimity instruction. *State v. Kiser*, 87 Wn. App. 126, 130, 940 P.2d 308 (1997).

Because of the expanse of time, because of the intervening time between acts of

assault, because of the different location of assaults, and because of the varying nature of

the assaults, we doubt whether all of the alleged acts of Denis Mulamba could be

comprised in one indivisible continuing course of conduct. Nevertheless, we decline to

thoroughly address whether the State presented sufficient evidence of a continuing course

of conduct, since the State, during its summation, told the jury that it could convict on the

basis of one discrete act, rather than a course of conduct. We also note that the State only

argues a pattern of abuse, not a course of conduct. The two concepts may be the same, but the State does not argue such.

In its response to Denis Mulamba's personal restraint petition, the State highlights two decisions: *State v. Nason*, 96 Wn. App. 686, 981 P.2d 866 (1999), and *State v. Kiser*, 87 Wn. App. 126 (1997). In the latter case, the State only charged Scott Kiser with first degree assault of a child under RCW 9A.36.120(1)(b)(ii)(A), the statutory subsection involving allegations of a prior pattern or practice of assaults on the victim child. This court held that, with the limited charge, the jury need not be unanimous as to the principal assault since the crime is defined by a course of conduct. The court, however, noted that some prosecutions may require unanimity, such as when the evidence disclosed more than one distinct episode of assaultive conduct during an extended charging period or the assaults occurred in different locations.

We note that some decisions permit the State to convict the accused of assault of a child without the jury being required to unanimously pinpoint one particular assault if the State relies only on a pattern of abuse and rests its charging decision solely on RCW 9A.36.120(1)(b) or RCW 9A.36.130(1)(b). *See State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984); *State v. Nason*, 96 Wn. App. 686, 696-97 (1999); *State v. Kiser*, 87 Wn. App. 126, 130 (1997). This valuable rule helps the prosecution to overcome difficulties in proof resulting from child witnesses who were abused on a regular basis for a prolonged period of time and can no longer distinguish one specific act from another.

*State v. Craven*, 69 Wn. App. 581, 589, n.7, 849 P.2d 681 (1993); *State v. Brown*, 55 Wn. App. 738, 746-47, 780 P.2d 880 (1989). Although the rule serves a worthwhile end, we question the validity of the rule and decisions applying the rule because both RCW 9A.36.120(1)(b) or RCW 9A.36.130(1)(b) require an act of intentional assault in addition to the pattern or practice of abuse. The *Kiser* court incorrectly assumed that the crime is defined only by a course of conduct, not a single act in addition to a course of conduct. The *Nason* court noted the need to prove a principal assault, but followed the ruling in *Kiser* anyway. A legislative change would be beneficial.

Having ruled that jury instructions 13 and 17 contravened Denis Mulamba's constitutional right to a unanimous jury, we must next determine whether the error was harmless. The State does not contend that, assuming an error, any error was harmless. This failure impedes its defense of the personal restraint petition.

Under the direct appeal standard of review, the failure to give the *Petrich* instruction, when required, is reversible unless the error is harmless beyond a reasonable doubt. *State v. Camarillo*, 115 Wn.2d 60, 64 (1990). The court presumes prejudice. *State v. Kitchen*, 110 Wn.2d 403, 411 (1988). In multiple acts cases, when the State failed to elect one discrete act or the jury received no unanimity instruction, we consider the error harmful if a rational trier of fact could have a reasonable doubt as to whether the State established one of the incidents beyond a reasonable doubt. *State v. Camarillo*, 115 Wn.2d at 64; *State v. Loehner*, 42 Wn. App. 408, 411, 711 P.2d 377 (1985) (Scholfield,

67

A.C.J., concurring). Conversely, the error is harmless only if no rational juror could have a reasonable doubt as to any of the incidents alleged. *Pope v. Illinois*, 481 U.S. 497, 501-03 (1987); *State v. Kitchen*, 110 Wn.2d at 411.

Most trial records do not permit confident inferences about whether the jury found evidence beyond a reasonable doubt as to each of the multiple acts. *State v. Camarillo*, 115 Wn.2d at 74 (Utter, J. concurring). Such inferences will be inappropriate in almost all cases. *State v. Camarillo*, 115 Wn.2d at 74 (Utter, J. concurring).

In *State v. Kitchen*, 110 Wn.2d 403 (1988), the high court reversed the conviction and remanded for a new trial because the jury heard conflicting testimony as to multiple alleged acts and a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred. In *State v. Petrich*, 101 Wn.2d 566 (1984), the court overturned the defendant's conviction because the court could not rule out prejudice due to the child's testimony when the State failed to elect one act as the crime. The victim in *Petrich* described with detail and specificity some of the acts committed against her, but other evidence of other acts suffered from confusion as to date and place and uncertainty regarding the type of sexual contact that took place.

After reviewing all of the possible criminal acts of Denis Mulamba and the testimony supporting and testimony contravening the existence of each purported criminal act, we conclude that a rational trier of fact could have a reasonable doubt as to at least one of the alleged assaults during the seventeen-day charging period.

We emphasize that Denis Mulamba lacked unlimited access to the children. Furthermore, Ashley Eli also agreed that she beat the children. The requisite harm that was an element of each assault could have been inflicted by Eli. The children identified Denis Mulamba as the primary abuser, but we do not know the access that the mother had to the children between her arrest and the trial. In the past, the children had been persuaded by the mother to skew the truth. Denis Mulamba testified and denied the events. Jane could not recall specific incidents.

Because Denis Mulamba raises the question of jury unanimity for the first time in his personal restraint petition, he must show that his right to a fair trial was actually and substantially prejudiced by constitutional error. *In re Personal Restraint of Sauve*, 103 Wn.2d 322, 325, 692 P.2d 818 (1985); *In re Personal Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984). Nevertheless, because of the importance of jury unanimity in Washington's constitutional constellation, the petitioner who shows that one juror could have concluded the State did not prove the existence of one of multiple acts, the petitioner will typically show substantial prejudice. *State v. Kitchen*, 110 Wn.2d 403, 412-13 (1988).

Denis Mulamba also contends that his counsel on direct appeal acted ineffectively by failing to argue that Mulamba's right to jury unanimity was breached. Because we directly review his jury unanimity instruction contention, we do not address this additional contention.

CONCLUSION

We grant Denis Mulamba's personal restraint petition. We order a retrial on the

two charges of assault of a child and and the two charges of criminal mistreatment.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, J.

No. 35087-8-III

KORSMO, A.C.J. (dissent) — The majority ignores Washington Supreme Court precedent in favor of outlier cases from the Ninth Circuit, erroneously reaching the conclusion that the State suppressed alleged impeachment evidence that the petitioner had minimal difficulty finding after trial.  What little of that information that might have been admissible at retrial was cumulative to that already admitted at trial and does not undermine confidence in the verdict.  For that reason, I dissent.  I also disagree with the court's erroneous dictum concerning the elements instruction.

*Brady Claim*

The *Brady* claim fails both the suppression prong and the materiality prong of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  For both reasons, this claim is without merit.

*Brady* and its progeny established that the government has a duty to disclose favorable evidence that is material to the guilt or punishment of the accused.  *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486, 276 P.3d 286 (2012).  This duty encompasses both impeachment and exculpatory evidence.  *Id.* at 486-487.  A prosecutor has a duty to

learn of and disclose any favorable information known by law enforcement.[1] *Id.* at 486.

A petitioner claiming a *Brady* violation must show that the evidence was favorable to

him, that it was suppressed by the State, and that this suppression prejudiced him. *Id.* at

486-487.

The PRP claims that the State failed to provide information that Ms. Eli acted out

in jail pending Mr. Mulamba's trial and her sentencing. He claims that her mental health

problems and her multiple violations of jail rules (including lying to jailers) were

admissible to impeach Ms. Eli.

*Suppression Prong.* In order to have a *Brady* violation, the information must be

suppressed by the government. There was no government suppression here.[2] The

information, to the extent it was available at all, was equally available to both sides. In

that circumstance, there is no government suppression of *Brady* material. *State v.*

*Mullen*, 171 Wn.2d 881, 895-896, 259 P.3d 158 (2011).

---

[1] This is in contrast to the discovery rules which only require the prosecution to turn over material in the possession and control of its staff. CrR 4.7(a)(4). Whether jail personnel are considered law enforcement in this context is an unsettled question, but it is not one that respondent develops and I will not further address the problem.

[2] Apparently recognizing the problem with this argument, Mr. Mulamba also claimed his trial counsel was ineffective for not obtaining the information. While there was no error, the failure of the *Brady* claim on the materiality prong also dooms the ineffectiveness claim under *Strickland v. Washington*, 466 U.S. 668, 689-691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

In fact, the records sought were not available to either party. Ms. Eli's mental (and physical) health records were protected from disclosure to anyone by the Uniform Health Care Information Act, ch. 70.02 RCW, and our state analog. 42 U.S.C. § 1320d-6; RCW 70.02.020. Similarly, her jail records were privileged under RCW 70.48.100. Kittitas County relied on that latter statute to reject Mulamba's initial public records act request for Eli's jail records. Ex. 29. He then obtained her permission to access all county jail and state prison records as well as her health records, and the county turned over what it had. Ex. 30.

Mr. Mulamba had equal access to the jail records because they were controlled by his co-defendant, Ms. Eli.[3] That, in fact, is how he ended up obtaining the information. There simply was no government suppression of the records.

*Materiality Prong.* The information Mr. Mulamba obtained also was inadmissible and/or cumulative. Accordingly, it was not material evidence under *Brady*.

Evidence is "material" if there is a reasonable probability that, if it had been disclosed to the defense, the result of the proceeding would have been different. *Mullen*, 171 Wn.2d at 894. The evidence is considered collectively, not item by item. *Id.* at 897. One important aspect of materiality under *Brady* is the admissibility of the evidence. *Id.*

---

[3] The State had no ability to spy on Ms. Eli in jail, on its behalf or for Mr. Mulamba, without running afoul of her Sixth Amendment right to counsel. *U.S. v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980).

3

If the evidence is not admissible, it is unlikely that its nondisclosure could affect the outcome of the proceeding. *Id.* (quoting *State v. Gregory*, 158 Wn.2d 759, 797, 147 P.3d 1201 (2006)). When evidence is cumulative of other evidence, it also may be immaterial. *Turner v. United States*, 582 U.S. ___, 137 S. Ct. 1885, 1887, 198 L. Ed. 2d 443 (2017); *United States v. Avellino*, 136 F.3d 249, 257 (2nd Cir. 1998) ("where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.").

Some other principles at play here also are worth mentioning since they would preclude admission of the evidence that the majority believes is material. Under ER 608(b), specific instances of a witness's conduct used to attack his credibility may not be proved by extrinsic evidence. "They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness . . . concerning the witness'[s] character for truthfulness or untruthfulness." *Accord Mullen*, 171 Wn.2d at 900.

In addition, the fact that a witness has medical or mental health history that might be of interest to the opposing side does not mean that it is material evidence that must be disclosed. *State v. Mines*, 35 Wn. App. 932, 937-940, 671 P.2d 273 (1983). Not only

4

does HIPAA[4] apply, but the doctor-patient privilege also applies. RCW 5.60.060(4). In order to balance these interests, courts may use the *in camera* procedure of CrR 4.7(h)(6) to consider whether there is material and disclosable evidence. *Mines*, 35 Wn. App. at 938-939.

Against these principles, it also is important to view the themes of this case. The prosecutor referred to Ms. Eli on occasion as "crazy," quoting Mr. Mulamba's testimony ("probably one piece of truth that came out of his mouth"),[5] but defense counsel made Ms. Eli's "craziness" the central feature of the defense argument. The theme was mentioned near the start of closing:

> the prosecutor starts off by talking how Ashley should still be believed. Who are we kidding? He is saying she's nuts. She's crazy but we should believe her when she says she can't remember . . . . Should we believe her when she had denied and denied ever of abusing her kids but then later said she did. Just a little – should you believe her? She's nuts. She's nuts today. She was nuts last week and she was nut the week of the 23rd through the 31st.

Report of Proceedings (RP) at 1099-1100.

Defense counsel repeated that Eli was "crazy" numerous times during his closing argument, and noted the prosecutor's argument:

> The prosecutor said this case hinge [sic] upon her. And she is crazy and crazy is not reliable. It's not believable.

---

[4] Health Insurance Portability and Accountability Act of 1996.
[5] Report of Proceedings at 1083.

RP at 1129. Counsel contrasted his client's presentation in court with that of Eli—"how did he present versus crazy Ashley? . . . Did he come across as crazy?" RP at 1130. Referencing the gruesome injuries depicted in the photographs, counsel noted: "We are all tired of looking at them but you have to be crazy to do that. He is not." RP at 1130. He then summed up his case theory:

> Crazy Ashley wanted to grab that dream. She's got a thing for Dennis and never let go. She may have known that Dennis wanted her to discipline her kids more. It is possible but we don't know for sure [sic] was spinning through her brain when she went nuts. But it's possible she's thinking you know I'm losing Dennis . . . . But if she does that to please him that does not make him responsible. He never solicited it. He never encouraged it.

RP at 1131.

Much of Ashley Eli's difficult life, and nearly every moment she spent with the two children during the charging period, was put before the jury. Both attorneys characterized her as "crazy" and the jury had sufficient evidence to draw the same conclusion. Given the two theories of the case, "crazy" simply was not in question; the identity of the assailant of the two children was the question. Was it the evil boyfriend or the crazy mother? If the latter, did she act alone?

The alleged jail misbehavior was far less damaging than the evidence determined to be cumulative in *Avellino*. There the government failed to produce evidence that its chief informant had perjured himself in other trials. 136 F.3d at 253. This evidence was not material under *Brady* in light of the fact that the informant could be impeached by the

6

terms of his favorable plea agreement with the government and other acknowledged illegal activities, including nine murders. *Id.* at 258-259.

Further evidence of craziness in jail was cumulative to an uncontested fact. The jail records simply did not amount to material evidence under *Brady* in light of the other evidence impeaching Eli, including her plea agreement, her abuse of the children, and evidence of her lifestyle and behavior during her relationship with Mulamba.

In addition, the evidence also was not material because it was not admissible. While Mr. Mulamba claims that the evidence was necessary to impeach Ms. Eli, none of the evidence rules permit the supposed impeachment evidence. Evidence that Eli misbehaved and broke many jail rules does not implicate her honesty, so ER 608 is not even in play. But even if that misbehavior did implicate her honesty, impeachment by extrinsic evidence is not permitted. ER 608(b); *Mullen*, 171 Wn.2d at 900 (could not use deposition from related civil case to impeach expert witness). Similarly, ER 404 would not have permitted the testimony. Character of a witness can only be established through ER 607, 608, or 609. ER 404(a)(3). Evidence of other bad acts cannot be admitted for the purpose of showing that the actor is a bad person. ER 404(b). Evidence that Ms. Eli was a bad prisoner simply was not relevant to any issue in the case.

But even if there was an evidence rule that permitted the testimony, the subject of the proposed impeachment was a collateral matter unrelated to Mulamba's case. Eli was called to testify at trial concerning the assaults on her children. Her behavior in jail was

7

not an issue. Washington long has excluded evidence that attempts to impeach a witness on collateral matters. "It is a well recognized and firmly established rule in this jurisdiction, and elsewhere, that a witness cannot be impeached upon matters collateral to the principal issues being tried." *State v. Oswalt*, 62 Wn.2d 118, 120-121, 381 P.2d 617 (1963) (citing *State v. Myers*, 47 Wn.2d 840, 290 P.2d 253 (1955); *State v. Fairfax*, 42 Wn.2d 777, 258 P.2d 1212 (1953); *State v. Gilmore*, 42 Wn.2d 624, 257 P.2d 215 (1953); *State v. Putzell*, 40 Wn.2d 174, 242 P.2d 180 (1952); *State v. Kritzer*, 21 Wn.2d 710, 152 P.2d 967 (1944); *O'Neil v. Crampton*, 18 Wn.2d 579, 140 P.2d 308 (1943); *Warren v. Hynes*, 4 Wn.2d 128, 102 P.2d 691 (1940); *State v. Johnson*, 192 Wash. 467, 73 P.2d 1342 (1937); *State v. Sandros*, 186 Wash. 438, 58 P.2d 362 (1936); *State v. Nolon*, 129 Wash. 284, 224 P. 932 (1924); *State v. Carroll*, 119 Wash. 623, 206 P. 563 (1922); *State v. Schuman*, 89 Wash. 9, 153 P. 1084 (1915); *State v. Stone*, 66 Wash. 625, 120 P. 76 (1912); *State v. Carpenter*, 32 Wash. 254, 73 P. 357 (1903)). "An issue is collateral if it is not admissible independently of the impeachment purpose." *State v. Fankhouser*, 133 Wn. App. 689, 693, 138 P.3d 140 (2006).

The majority also speculates that the fact that a jailer believed Eli was a liar somehow was relevant. As noted earlier, extrinsic evidence of lying is not admissible in Washington. ER 608(b). Reputation for dishonesty may be admissible in some circumstances. ER 608(a). However, I have never heard of a "community" of jailers being a relevant community for purposes of admitting such evidence, nor has the majority

8

suggested that it is. *Cf. State v. Land*, 121 Wn.2d 494, 497-500, 851 P.2d 678 (1993). While undoubtedly prosecutors would love to have a rule that allows law enforcement officers to express their opinion of a defendant's honesty within the law enforcement (or jail) community, no rule permits such testimony. Eli's reputation for honesty among jail employees was irrelevant.

The cases relied on by the majority are not to the contrary. Primary is *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002), a case that is distinguishable on quite a few different bases. There, despite being under a court order to produce records concerning a paid informant's dealings with the police, the records were not produced. The specific instance cited by the majority as being relevant here involved the informant falsely telling police he had evidence that Mr. Benn was the Green River killer. *Id*. at 1056-1057. Evidence of the informant's bias against the defendant was, of course, highly relevant and therefore admissible. ER 401, ER 608(b), ER 613(b); *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009); *State v. Robbins*, 35 Wn.2d 389, 395, 213 P.2d 310 (1950). Here, Eli's behavior in jail does not show bias against Mulamba.

Equally unavailing is the majority's reliance on *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006). There a witness had been interviewed by defense counsel and falsely reported prior to trial that she had not used drugs since 1999. *Id*. at 798. Government records showed that the witness had relapsed more than a year later and had to enter into drug treatment. *Id*. The evidence was admissible to contradict her answer

9

during the defense interview. ER 613(b).[6] It also served to contradict the State's

repeated argument that the witness should be believed because she had rehabilitated

herself. 158 Wn.2d at 799-800. *Gregory* is not relevant to this case. Whether Eli lied to

a jailer about her activities in the jail has no bearing on whether she lied on the stand

about Mulamba's involvement in the assault on the children. Were the rule otherwise,

any witness who had lied to a teacher about where his or her homework was would be

impeachable for life. Telling an irrelevant lie simply is not a basis for impeachment at

trial.

Although not central to the majority's analysis, there is a disconnection between

Mulamba's argument and the allegedly suppressed evidence. The majority reasons that

"Eli was motivated to testify favorably to the State" because she could have been charged

with additional crimes for misbehaving in jail. That argument makes no sense at all. Eli

had already pleaded guilty with the expectation that she would testify concerning

Mulamba's actions. The deal had been struck prior to her jail misbehavior and the nature

of her anticipated testimony was already known. She received no immunity from future

criminal behavior and could not anticipate lenient treatment on other crimes just because

she still needed to fulfill an existing bargain. Mulamba's argument has no basis in logic.

---

[6] *State v. Swan*, 114 Wn.2d 613, 653-654, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991); *State v. Ciskie*, 110 Wn.2d 263, 281, 751 P.2d 1165 (1988); *State v. Renneberg*, 83 Wn.2d 735, 738, 522 P.2d 835 (1974); *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969).

There was no suppression of evidence. The evidence also was cumulative and inadmissible. For all of those reasons, the *Brady* claim fails.

*Jury Unanimity*

By way of dicta, the majority also claims that a unanimity instruction was necessary in this case. It was not.

First and second degree child assault are both alternative means crimes. 13A SETH A. FINE, WASHINGTON PRACTICE: CRIMINAL LAW AND SENTENCING, § 4.10 at 93 (3d ed. 2019). In essence, the crimes can be committed by either (a) assault resulting in severe injury or (b) by engaging in an assault that is part of a pattern of assault or torture. RCW 9A.36.120(1), .130(1). For simplicity of discussion, I will call them the (a) and (b) prongs.

The majority correctly notes that jury unanimity is required in all criminal cases by art. I, § 21, of our constitution. It also correctly notes that in instances of multiple criminal acts, the jury must be instructed that it needs to be unanimous on the act involved. The majority also recognizes that the right to jury unanimity extends to alternative means cases. However, the majority misses a nuance that leads to the erroneous conclusion that unanimity instructions were needed in this case. Although all jurors needed to agree that each child assault charge had been committed, they were not required to be in agreement on the means by which each crime occurred. *See State v. Whitney*, 108 Wn.2d 506, 511-512, 739 P.2d 1150 (1987); *State v. Franco*, 96 Wn.2d

11

816, 822-824, 639 P.2d 1320 (1982). Instead, the right to unanimity is satisfied if there is sufficient evidence to support each means of the offense or if there is an express verdict on a specific means should any of the charged means lack sufficient evidence. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). If the evidence is insufficient on one of the means of committing the offense, a general verdict must be reversed and the case remanded for a new trial. *State v. Woodlyn*, 188 Wn.2d 157, 165, 392 P.3d 1062 (2017).

Jurors were expressly instructed that they needed to agree on each verdict. Ex. 6 at 74. The sufficiency of the evidence is not at issue in this case. Accordingly, as a matter of law, jury unanimity was assured. *Owens*, 180 Wn.2d 90; *Whitney*, 108 Wn.2d 506; *Franco*, 96 Wn.2d 816. The trial court did not err in instructing the jury.

The majority, however, wrongly focuses on cases where the only alternative charged was the (b) prong. In those instances, the charges are treated as multiple acts cases since the (a) prong alternative is not present and there is no "alternative" to consider. Further, since the (b) prong consists of an assault plus a pattern, there must be agreement on the act of assault underlying a (b) prong prosecution. In the case of a single count charged solely under the (b) prong, unanimity is required because it is a multiple acts case.

Here, however, this is an alternative means case and no unanimity was required on any particular means. One or more jurors could find guilt based on prong (a) and others could find guilt based on prong (b) without agreeing on a specific assaultive act—one

12

believing pliers were used, one a coaxial cable, etc. As long as all 12 believed Mr. Mulamba committed the crime, no agreement on the method of committing the single offense was necessary.

On the facts of this case, the majority's dicta would erroneously convert this alternative means prosecution into a multiple acts case even though multiple violations of the statutes were not charged. This effectively strips the jury of the ability to unanimously agree that Mr. Mulamba committed the charged offenses but differ on the means of commission and totally frustrates the legislative scheme. Accordingly, I dissent from the discussion of the alleged instructional error.

There was no *Brady* violation. The trial court did not err in instructing the jury on the child assault counts. Accordingly, I respectfully dissent from the majority's grant of relief from personal restraint.

_____
Korsmo, ACJ.

13